FENNEMORE CRAIG, P.C.
David A. Weatherwax (No. 006996)
Dewain D. Fox (No. 014431)
3003 North Central Avenue, Suite 2600
Phoenix, Arizona 85012-2913
Telephone: (602) 916-5000
Facsimile: (602) 916-5675
Email: dweather@fclaw.com
Email: dfox@fclaw.com
Attorneys for Citigroup Global Markets Realty
Corp.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| KABUTO ARIZONA PROPERTIES, LLC, | Case No. 2:09-bk-11282-GBN |
| Debtor. | **CITIGROUP GLOBAL MARKETS REALTY CORP.'S EMERGENCY MOTION TO EXCUSE TURNOVER OF PROPERTY BY COURT APPOINTED RECEIVER** |

Pursuant to 11 U.S.C. § 543(d)(1), Citigroup Global Markets Realty Corp. ("Citigroup") respectfully asks the Court to enter an Order excusing the Receiver appointed by the Maricopa County Superior Court from turning over possession and control over the Wigwam Golf Resort & Spa (the "Wigwam") and the Biltmore Golf Courses (the "Golf Courses") to Kabuto Arizona Properties, LLC (the "Debtor").

By way of background, as shown below, the Debtor owns the Wigwam and the Golf Courses. Citigroup loaned $65,000,000 to the Debtor, and holds a first-position security interest against (among other things) the Wigwam and the Golf Courses. Debtor defaulted on its obligations to Citigroup, by (among other things) failing to make payments due from November 2008 to April 2009.

On April 14, 2009, Starwood Hotels & Resorts Management Company, Inc. ("Starwood")--which managed the Wigwam pursuant to a Management Contract--notified the Debtor and Citigroup that, as a result of the Debtor's defaults under the Management Contract, Starwood has terminated the Management Contract effective "at 11:59 p.m. on May 29, 2009". Citigroup is informed and believes that, at or about the same time (April

14), Starwood advised all of its employees at the Wigwam that their employment was terminated as of May 29, 2009.

On April 16, 2009, Citigroup filed a lawsuit (CV2009-011898) against the Debtor in the Maricopa County Superior Court (the "State Court"), and sought the immediate appointment of a Receiver over the Wigwam and the Golf Courses. On April 24, 2009, pursuant to a Stipulation, the State Court signed an Order appointing Douglas Wilson Companies as the Receiver. The Receiver took possession of the Wigwam that same day (April 24), has been overseeing the operation of the Wigwam since April 24, and has made arrangements to have a qualified property manager in place to manage the Wigwam when Starwood's termination is effective on May 29.

On Friday, May 22, 2009 at 6:53 p.m., the Debtor filed this bankruptcy case. At 9:16 p.m. that same night--which was the Friday before the long Memorial Day holiday weekend--the Debtor's counsel e-mailed a letter to counsel for Citigroup, the Receiver and Starwood. The letter stated that "your respective clients are required to turn over to [the Debtor] any and all [estate] property subject to their control", and directed them to contact the Debtor's counsel "to arrange for the immediate turnover of all property subject to Bankruptcy Code § 542".

Pursuant to 11 U.S.C. § 543(d), Citigroup respectfully asks the Court to excuse the Receiver from turning over possession of the Wigwam and the Golf Courses to the Debtor, because "the interests of the creditors . . . would be better served by permitting [the Receiver] to continue in possession, custody, or control of such property". In this regard, as shown below, the interests of the creditors strongly weigh in favor of permitting the Receiver to stay in control of the property, because (among other things): (1) the Wigwam is a 331-casita luxury resort and spa property, which consistently receives AAA's "Four Diamond Award"; (2) it is essential that the Wigwam continue to be managed by a qualified property manager that maintains a nationwide reservation network for luxury properties; (3) Starwood has resigned as property manager effective May 29; (4) the Receiver selected a qualified replacement manager, which is in the process of

transitioning to replace Starwood; and (5) there is insufficient cash flow from the property to fund operating expenses, and Citigroup is informed and believes that the Debtor does not have financing in place to fund the anticipated shortfall.

This Motion is supported by the following Memorandum of Points and Authorities.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   FACTUAL BACKGROUND

### A.   THE DEBTOR AND THE PROPERTY

1.   The Debtor owns the Wigwam and the Golf Courses (collectively, the "**Property**").

2.   The Wigwam has been a renowned Arizona landmark since its opening in 1929, and is a consistent recipient of AAA's prestigious Four Diamond Award. The Wigwam is a luxury resort with the following amenities (among others): (i) 331 adobe-style casitas and suites; (ii) a signature Elizabeth Arden Red Door Spa with 26,000 square feet of treatment areas, including 16 luxurious treatment rooms; (iii) over 110,000 square feet of meeting and event facilities; (iv) two swimming pools; (v) nine tennis courts and a tennis pro shop; (vi) three championship 18-hole golf courses and a golf pro shop; (vii) a fitness facility; and (viii) several restaurants and lounges.

3.   Starwood currently manages and operates the Wigwam pursuant to a Management Contract. The Wigwam is part of Starwood's "Luxury Collection" of resort and spa properties. By way of comparison, The Phoenician appears to be the only other Arizona resort that is part of Starwood's Luxury Collection. The Luxury Collection includes only 12 other properties in the United States, and a number of other prestigious properties around the world.

4.   The Golf Courses include two championship golf courses, which are located near the Biltmore Resort (which itself is not part of Citigroup's collateral and is not part of this

---

[1]   Exhibits 1 through 13 to this Motion are identical to Exhibits 1 through 13 to Citigroup's "(1) Notice of Nonconsent to Debtor's Use of Cash Collateral; (2) Demand for Sequestration and Accounting; and (3) Motion to Compel Turnover of Cash Collateral"--which is being filed contemporaneously with this Motion. In the interest of time and judicial economy, only Exhibits 14 and 15 are being attached to this Motion.

FENNEMORE CRAIG, P.C.

PHOENIX

bankruptcy case), a food and beverage outlet and a golf pro shop.

**B. THE LOAN**

1. On or about June 12, 2007, Citigroup (as "Lender") and Debtor (as "Borrower") entered into a written agreement entitled "Loan and Security Agreement" (the "Loan Agreement"), pursuant to which Lender agreed to loan $65,000,000 to Debtor on certain terms and conditions (the "Loan"). A true copy of the Loan Agreement is attached as **Exhibit 1** and incorporated herein.

2. The Loan Agreement provides (among other things) as follows:

**"Section 2.1 Loan.**

(A) **Loan.** Subject to the terms and conditions of this Loan Agreement . . . Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, the Loan, in the aggregate amount of $65,000,000.00 (such loan and the obligation of Borrower to repay the same together with all interest and other amounts from time to time owing hereunder are referred to collectively herein as the 'Loan'). Borrower's obligation to pay the principal and interest on the Loan (including late charges, Default Rate interest, and the Prepayment Consideration, if any) shall be evidenced by this Loan Agreement and by the Note, duly executed and delivered by Borrower.

\* \* \*

**Section 2.2 Interest.**

(A) **Rate of Interest**. The outstanding principal balance of the Loan shall bear interest at a rate per annum equal to the Interest Rate.

(B) **Default Rate**. Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default . . . the Principal Balance of the Loan and all other outstanding Obligations shall bear interest until paid in full at a rate per annum that is five percent (5.0%) in excess of the Interest Rate otherwise applicable under this Loan Agreement and the Note (the 'Default Rate').

(C) **Computation of Interest**. Interest on the Loan and all other Obligations owing to Lender shall be computed on the basis of a 360-day year, and shall be charged for the actual number of days elapsed during any month or other accrual period. . . .

\* \* \*

(E) **Late Charges**. If any payment of principal, interest or other sums shall not be made to Lender on the date the same is due hereunder or under any of the other Loan Documents, then Borrower shall pay to Lender, in addition to all sums otherwise due and payable, a late fee in an amount equal to five percent (5.0%) of such principal, interest or other sums due

hereunder or under any other Loan Document (or, in the case of a partial payment, the unpaid portion thereof), such late charge to be immediately due and payable without demand by Lender.

\*     \*     \*

**Section 2.4  <u>Payments</u>**.

(A) **<u>Payments of Interest and Principal</u>**.  Borrower shall make a payment to Lender of interest only on the Closing Date for the period from the Closing Date through July 5, 2007.  Commencing on the sixth (6th) day of August, 2007 (the '<u>First Payment Date</u>') and on the sixth (6th) day of each calendar month thereafter (each, with the First Payment Date, a '<u>Payment Date</u>'), through and including July 6, 2009, Borrower shall make a payment (each, a '<u>Monthly Interest Payment</u>') of interest on the unpaid Principal Balance accrued at the Interest Rate through the date one calendar day prior to such Payment Date.  Commencing on August 6, 2009 (the '<u>Amortization Commencement Date</u>') and on each Payment Date thereafter, Borrower shall make monthly payments of principal and interest in the amount of the Monthly Debt Service Payment Amount for such Payment Date (each Monthly Interest Payment and, from and after the Amortization Commencement Date, each monthly payment of the Monthly Debt Service Payment Amount, is herein referred to as a '<u>Monthly Debt Service Payment</u>').  Prior to the occurrence of an Event of Default, all Monthly Debt Service Payments shall be applied first to accrued and unpaid interest on the Loan and the balance to the payment of principal on the Loan.  After an Event of Default, Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower in such order of priority as Lender may deem advisable.

\*     \*     \*

**Section 2.6  <u>Prepayment</u>**.

\*     \*     \*

(B) **<u>Prepayment Consideration Due</u>**.  If the Maturity Date shall be accelerated to a date prior to the Scheduled Maturity Date, or if any prepayment of all or any portion of the Principal Balance hereunder occurs, whether in connection with Lender's acceleration of the unpaid Principal Balance of the Loan or in any other circumstances whatsoever, or if the Mortgage is satisfied or released by foreclosure (whether by power of sale or judicial proceeding), deed in lieu of foreclosure or by any other means, then the Prepayment Consideration shall become immediately due and owing and Borrower shall forthwith pay the Prepayment Consideration to Lender. . . .

\*     \*     \*

**Section 6.1  <u>Security Interest in Reserves; Other Matters Pertaining to Reserves</u>**.

(A) Borrower hereby pledges, assigns and grants to Lender a security

FENNEMORE CRAIG, P.C.

PHOENIX

interest in and to all of Borrower's right, title and interest in and to the Reserves, as security for payment and performance of all of the Obligations hereunder and under the Note and the other Loan Documents. The Reserves constitute Account Collateral and are subject to the security interest in favor of Lender created herein and all provisions of this Loan Agreement and the other Loan Documents pertaining to Account Collateral.

\* \* \*

(B) In addition to the rights and remedies provided in Article VII and elsewhere herein, upon the occurrence of any Event of Default, Lender shall have all rights and remedies pertaining to the Reserves as are provided for in any of the Loan Documents or under any applicable law. Without limiting the foregoing, upon and at all times after the occurrence and during the continuance of any Event of Default, Lender in its sole and absolute discretion, may use the Reserves (or any portion thereof) for any purpose, including but not limited to any combination of the following: (i) payment of any of the Obligations including the Prepayment Consideration applicable upon such payment in such order as Lender may determine in its sole discretion; provided, however, that such application of funds shall not cure or be deemed to cure any default; (ii) reimbursement of Lender for any losses or expenses (including, without limitation, reasonable legal fees) suffered or incurred as a result of such Event of Default; (iii) payment for the work or obligation for which such Reserves were reserved or were required to be reserved; and (iv) application of the Reserves in connection with the exercise of any and all rights and remedies available to Lender at law or in equity or under this Loan Agreement or pursuant to any of the other Loan Documents.

\* \* \*

**Section 6.3  Impositions and Insurance Reserve**.  On the Closing Date Borrower shall deposit with Lender (or such agent of Lender as Lender may designate in writing to Borrower from time to time) $378,940.89, and thereafter Borrower shall deposit with Lender monthly, on each Payment Date commencing with the First Payment Date, 1/12th of the annual charges (as estimated by Lender) for all Impositions and Insurance Premiums payable with respect to the Property hereunder (said funds, together with any additions thereto, the 'Impositions and Insurance Reserve'); provided, that no deposits shall be required into the Impositions and Insurance Reserve for Insurance Premiums so long as no Event of Default exists and Borrower provides Lender with paid receipts and other evidence satisfactory to Lender that all Insurance Premiums have been and continue to be fully and timely paid, in each instance at least thirty (30) days prior to the expiration of each applicable insurance policy. Borrower shall also deposit with Lender on demand, to be added to and included within such reserve, a sum of money which Lender reasonably estimates, together with such monthly deposits, will be sufficient to make the payment of each such charge at least thirty (30) days prior to the date initially due. Borrower shall provide Lender with bills and all other documents necessary for the payment of the foregoing charges at least thirty (30) days prior to the date on which each payment shall first become due. So long as (i) no Event of Default has occurred and is continuing, (ii) Borrower has provided Lender with the foregoing bills and other documents in a timely manner, and (iii) sufficient funds are held by Lender

FENNEMORE CRAIG, P.C.

PHOENIX

for the payment of the Impositions relating to the Property, Lender shall pay said items or disburse to Borrower from such Reserve amounts sufficient to pay said items.

**Section 6.4  Capital Improvements Reserve**.  At Closing, Borrower shall reserve from the proceeds of the Loan and shall deposit with Lender $5,000,000.00 (said funds, together with any interest thereon and additions thereto, the 'Capital Improvements Reserve'). . . .

\*      \*      \*

**Section 6.6  FF&E Reserves**.

(A) Subject to the proviso in clause (B) below, Borrower shall pay to Lender on each Payment Date an amount equal to 4% of Gross Revenues for the Wigwam Hotel for the second full calendar month prior to the Payment Date in question (e.g., the Required Percentage of Gross Revenues for June, 2007 will be deposited on the Payment Date in August, 2007) (such amounts so deposited shall hereinafter be referred to as the 'Hotel FF&E Reserve Monthly Deposit'). . . . Amounts so deposited shall hereinafter be referred to as Borrower's 'Hotel FF&E Reserve'.

\*      \*      \*

(E) In addition to the foregoing, Borrower shall pay to Lender on each Payment Date an amount equal to 2% of Gross Revenues attributable to the Arizona Biltmore Golf Property and Wigwam Golf Course for the second full calendar month prior to the Payment Date in question (e.g., the percentage of Gross Revenues for June, 2007 will be deposited on the Payment Date in August, 2007) (such amounts so deposited shall hereinafter be referred to as the 'Golf Course FF&E Reserve Monthly Deposit'). . . . Amounts so deposited shall hereinafter be referred to as 'Golf Course FF&E Reserve'.

\*      \*      \*

**Section 6.8  GPS Lease Payment Reserve**.  On the Closing Date, Borrower shall deposit with Lender (or such agent of Lender as Lender may designate in writing to Borrower from time to time) $59,700 (said funds, together with any interest thereon and any additions thereto (the 'GPS Lease Payment Reserve'). . . .

\*      \*      \*

**Section 7.1  Establishment of Collection Account Upon Trigger Event**.

(A) **Collection Account**. If an Event of Default exists . . . (either event, a 'Cash Management Event'), Lender may establish, or upon Lender's request Borrower shall establish, with a depository institution selected by Lender, an Eligible Account for the benefit of the Lender, as secured party hereunder, to serve as the 'Collection Account' (said account, and any account replacing the same in accordance with this Loan Agreement, the 'Collection Account'; and the depository institution in which the Collection Account is maintained, the 'Collection Account Bank'). The Collection Account shall be under the sole dominion and control of Lender

(which dominion and control may be exercised by Servicer), and Borrower shall have no rights to control or direct the investment or payment of funds therein. . . .

\*     \*     \*

**Section 7.2   Deposit of Receipts into the Collection Account**. If a Cash Management Event occurs, Lender may, and Borrower shall (a) cause Hotel Manager (other than Starwood while the Starwood Management Agreement is in place), Biltmore Golf Course Manager and Wigwam Golf Course Manager, to deposit all Receipts, Rents and other amounts received directly to Lender or at Lender's option into the Collection Account and shall deliver an irrevocable (without Lender's written consent) letter of direction to such effect to Hotel Manager (other than Starwood while the Starwood Management Agreement is in place), Biltmore Golf Course Manager and Wigwam Golf Course Manager in Lender's required form, and (b) direct Starwood to deliver all Starwood Remittances directly to Lender or at Lender's option into the Collection Account. Borrower shall and shall cause Wigwam Golf Course Manager, Biltmore Golf Course Manager and Hotel Manager (but with respect to Hotel Manager, only in the event of, and from and after the termination of the Starwood Management Agreement) to (i) instruct each of the credit card banks, credit card companies or other credit card receipt intermediaries with which Borrower has entered into merchant, clearing or other agreements with respect to the Property that all credit card receipts with respect to the Property cleared by such credit card banks, credit card companies or other intermediaries shall be transferred by such credit card banks, credit card companies or other intermediaries by wire transfer or the ACH system to the Collection Account, and deliver irrevocable (without Lender's prior written consent) instruction letters to such effect to such Persons (and obtain each such Person's acknowledgment and agreement thereto) in Lender's reasonable form, (ii) instruct all Persons that maintain open accounts with Borrower, Hotel Manager, Wigwam Golf Course Manager or Biltmore Golf Course Manger or with whom any of the foregoing does business on an 'accounts receivable' basis with respect to the Property to deliver all payments due under such accounts to the Collection Account, and deliver to such Persons irrevocable (without Lender's written consent) letters of instruction in Lender's reasonable form, and (iii) cause (and cause any new Hotel Manager, Wigwam Golf Course Manager or Biltmore Golf Course Manger to) deposit any and all other Receipts and Rents (including Receipts and Rents that are not paid into the Collection Account in accordance with the foregoing) to be deposited promptly into the Collection Account and in no event later than two (2) Business Days after the same are paid to or for the benefit of Borrower. . . . To the extent that Borrower or any Person on Borrower's behalf holds any Receipts or Advance Bookings, whether in accordance with this Loan Agreement or otherwise, (i) such amounts shall be deemed to be Collateral and shall be held in trust for the benefit, and as the property, of Lender, and (ii) such amounts shall not be commingled with any other funds or property of Borrower, Hotel Manager, Wigwam Golf Course Manager or Biltmore Golf Course Manger. Borrower shall cause to be paid to Lender all Advance Bookings upon the occurrence of any Event of Default.

**Section 7.3   Application of Funds in Accounts**.

FENNEMORE CRAIG, P.C.

PHOENIX

(A) **Allocations**.  If any Event of Default shall occur and continue beyond any applicable cure period provided herein, then notwithstanding anything to the contrary in this Section or elsewhere, Lender shall have all rights and remedies available under applicable law and under the Loan Documents. . . .

\*       \*       \*

(B) **Event of Default**.  Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default beyond any applicable cure period provided herein, all funds on deposit in the Accounts and Reserves shall be disbursed to or as directed by Lender. Without in any way limiting the foregoing or Lender's rights and remedies upon an Event of Default, and subject to Lender's direction otherwise from time to time, in whole or in part, in Lender's sole and absolute discretion, after and during the continuance of an Event of Default beyond any applicable cure period provided herein Lender may direct the Account Banks to allocate all available funds on deposit in the Accounts and in any Reserves to:  (a) any debt service or other Obligation due under this Loan Agreement or the other Loan Documents; (b) any reserve account or sub-account established under this Loan Agreement for, or otherwise as a reserve for, operating expenses, taxes, insurance, capital expenses, costs and expenses of maintenance, repairs and restoration, and other expenditures relating to the use, management, operation or leasing of the Property; and/or (c) any costs and expenses incurred by Lender in connection with such Event of Default, or expended by Lender to protect or preserve the value of the Property.

\*       \*       \*

**Section 7.5  Sole Dominion and Control**.  Borrower acknowledges and agrees that the Accounts and Reserves are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof. . . .

\*       \*       \*

**Section 7.6  Pledge of Accounts and Reserves**.

(A) **Security for Obligations**.  To secure the full and punctual payment and performance of all Obligations of Borrower under this Loan Agreement, the Note, the Mortgage, and all other Loan Documents, Borrower hereby grants to Lender a first priority continuing security interest in and to the following property of Borrower, whether now owned or existing or hereafter acquired or arising and regardless of where located (all of the same constituting part of the Account Collateral hereunder:

(i) the Accounts, Reserves and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts or Reserves, including, without limitation, all deposits or wire transfers made to the Accounts or Reserves; and any and all Account Collateral;

(ii) any and all amounts invested in Permitted Investments;

FENNEMORE CRAIG, P.C.

PHOENIX

(iii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

(iv) to the extent not covered by clauses (i), (ii) or (iii) above, all 'proceeds' (as defined under the UCC) of any or all of the foregoing.

Lender shall have with respect to the foregoing collateral, in addition to the rights and remedies herein set forth, all of the rights and remedies available to a secured party under the UCC, as if such rights and remedies were fully set forth herein.

(B) **Rights on Default**.  Upon the occurrence and during the continuance of an Event of Default beyond any applicable cure period provided herein, Lender may direct each Account Bank to liquidate and transfer any amounts then invested in Permitted Investments to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable each Account Bank, as agent for Lender, or Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Account Collateral, and Lender may apply any Account Collateral to any Obligations in such order of priority as Lender may determine.  The proceeds of any disposition of the Account Collateral, or any part thereof, may be applied by Lender to the payment of the Obligations in such priority and proportions as Lender in its discretion shall deem proper.

\*      \*      \*

(D) **Security Agreement**.  This Loan Agreement is a security agreement and shall create a continuing security interest in the Account Collateral.

**Section 7.7   Lender Appointed Attorney-In-Fact**. Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, coupled with an interest and with full power of substitution, to execute, acknowledge and deliver after an Event of Default that continues beyond any applicable cure period provided herein any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Account Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower is required to do hereunder or under the other Loan Documents or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein and to accomplish the purposes of this Loan Agreement.

\*      \*      \*

**Section 8.1  Event of Default**.

'**Event of Default**' shall mean the occurrence or existence of any one or more of the following:

(A) **Scheduled Payments**. Failure of Borrower to pay any scheduled

FENNEMORE CRAIG, P.C.

PHOENIX

payment amount when the same is due under this Loan Agreement, the Note, or any other Loan Documents (whether such amount is interest, principal, Reserves, or otherwise), including without limitation the failure to pay all outstanding Obligations on the Maturity Date; or

(B) **Other Payments**. Failure of Borrower to pay any amount from time to time owing under this Loan Agreement, the Note, or any other Loan Documents (other than amounts subject to the preceding paragraph) within ten (10) days after written notice from Lender to Borrower that same is due; or

\* \* \*

(D) **Breach of Provisions Regarding Insurance, Transfers, Liens, Single Purpose**. (i) Failure to keep in force the insurance required by Section 5.4 hereof; (ii) the failure to comply with any other covenant of Section 5.4 which failure under this clause (ii) continues for five (5) Business Days after notice from Lender; (iii) breach of Article IX or Article XI hereof; (iv) breach or default under any of Sections 5.13(B), 5.17, 5.18 or 5.19 hereof; or (v) breach or default under Section 6.6(A) hereof or Section 7.2 hereof

\* \* \*

(J) **Solvency**. Borrower ceases to be solvent or admits in writing its inability to pay its debts as they become due; or

\* \* \*

(N) **Cross-Default with Other Loan Documents**. A default beyond any applicable grace periods shall occur under any of the other Loan Documents; or

(O) **Default under Management Agreements**. Any event of default on the part of Borrower shall occur and be continuing under the Hotel Management Agreement, Wigwam Golf Course Management Agreement or Biltmore Golf Course Management Agreement.

\* \* \*

**Section 8.2  Acceleration and Remedies**.

(A) . . . Upon and at any time after the occurrence of any other Event of Default, at the option of Lender, which may be exercised without notice or demand to anyone, all or any portion of the Loan and other Obligations shall immediately become due and payable.

\* \* \*

(B) Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Loan Agreement or any of the other Loan Documents, or at law or in equity, may be exercised by Lender at any time and from time to time, whether or not all or any of the Obligations shall be declared due and payable, and whether or not Lender shall have

commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. . . .

\*       \*       \*

(D) Upon the request of Lender (or its nominees and successors and assigns) in connection with a foreclosure, deed in lieu of foreclosure or other acquisition of the Property resulting from an Event of Default, Borrower shall cooperate with Lender (and its nominees and successors and assigns) in (i) the transfer to Lender (or such nominee, successor or assign) of any licenses and permits (including, without limitation, liquor licenses) necessary or appropriate for the operation of the Property; (ii) the obtaining by Lender (or such nominee, successor or assign) of any licenses and permits (including, without limitation, liquor licenses) necessary or appropriate for the operation of the Property; and (iii) the continuation by Borrower or any tenant of any existing licenses and permits (including, without limitation, liquor licenses) and/or arrangements for liquor sales and service to be conducted by third party venders, under catering licenses or otherwise, until new licenses and permits are obtained.

\*       \*       \*

(F) The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Loan Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon."

3. The Debtor executed a Promissory Note (the "Note") in favor of Citigroup, in order to evidence the Loan. A true copy of the Note is attached as **Exhibit 2** and incorporated herein. Citigroup is the owner and holder of the Note.

4. In addition to the security interest provided by the Loan Agreement, Debtor's obligations under the Loan Agreement and Note are secured by, among other things: (i) a "Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture

Filing" executed by Debtor in favor of Lender (the "Deed of Trust"); (ii) a separate "Assignment of Leases and Profits" executed by Debtor in favor of Lender (the "Lease Assignment"); (iii) an "Assignment of Agreements, Licenses, Permits and Contracts" executed by Debtor in favor of Lender (the "License Assignment"); (iv) a "Security Agreement and Assignment of Golf Course Management Agreement (Wigwam)" executed by Debtor and GSA in favor of Lender (the "Wigwam Security Agreement"); (v) a "Security Agreement and Assignment of Golf Course Management Agreement (Biltmore)" executed by Debtor and GSA in favor of Lender (the "Biltmore Security Agreement"); (vi) an "Assignment of Operating Agreements" executed by Debtor in favor of Lender (the "Starwood Assignment"); (vii) a "Security Agreement (Pledge of TypeTwo Inc. Stock)" executed by Debtor in favor of Lender (the "TypeTwo Pledge"); and (viii) a "Collateral Assignment of TypeTwo Lease Agreement" executed by Debtor in favor of Lender (the "TypeTwo Assignment"). True copies of the Deed of Trust, the Lease Assignment, the License Assignment, the Wigwam Security Agreement, the Biltmore Security Agreement, the Starwood Assignment, the TypeTwo Pledge, and the TypeTwo Assignment are attached as **Exhibits 3-10**, respectively, and are incorporated herein. The Deed of Trust, the Lease Assignment, the License Assignment, the Wigwam Security Agreement, the Biltmore Security Agreement, the Starwood Assignment, the TypeTwo Pledge, and the TypeTwo Assignment, and all other documents executed in connection therewith, are referred to collectively as the "**Security Agreements**." The Loan Agreement, the Note and the Security Agreements are referred to collectively as the "**Loan Documents**".

5. Citigroup holds the beneficial and other interests under the Loan Agreement and **Security Agreements** which give Citigroup (among other things) a valid, properly perfected, first priority lien against, and/or direct assignment of, the **Property**.

6. The Loan Documents provide that, upon default, Citigroup has the right of entry, the right to accelerate the entire unpaid balance of the Loan and the right to the appointment of a receiver. Specifically, in this regard, the Deed of Trust (Exhibit 3)

FENNEMORE CRAIG, P.C.

PHOENIX

provides, among other things, as follows:

17. <u>Remedies</u>. Upon the occurrence and during the continuance of an Event of Default, [Lender] may, at [Lender's] option, by [Lender] itself, or otherwise, do any one or more of the following:

\*     \*     \*

(b) <u>Right of Entry</u>. [Lender] or Trustee may, prior or subsequent to the institution of any foreclosure proceedings, enter upon the Mortgaged Property, or any part thereof, and take exclusive possession of the Mortgaged Property and of all books, records, and accounts relating thereto and to exercise without interference from [Borrower] any and all rights which [Borrower] has with respect to the management, possession, operation, protection, or preservation of the Mortgaged Property, including, without limitation, the right to rent the same for the account of [Borrower] and to deduct from such Profits all costs, expenses, and liabilities of every character incurred by the [Lender] or Trustee in collecting such Profits and in managing, operating, maintaining, protecting, or preserving the Mortgaged Property and to apply the remainder of such Profits on the Debt in such manner as [Lender] may elect. All such costs, expenses, and liabilities incurred by [Lender] or Trustee in collecting such Profits and in managing, operating, maintaining, protecting, or preserving the Mortgaged Property, if not paid out of Profits as hereinabove provided, shall constitute a demand obligation owing by [Borrower] and shall bear interest from the date of expenditure until paid at the Default Rate as specified in the Note, all of which shall constitute a portion of the Debt. If [Lender] or Trustee elects to enter the Mortgaged Property as provided for herein, [Lender] or Trustee may invoke any and all legal remedies to dispossess [Borrower], including specifically one or more actions for forcible entry and detainer, trespass to try title, and restitution. . . .

(c) <u>Right to Accelerate</u>. [Lender] may, without notice or demand, declare the entire unpaid balance of the Debt immediately due and payable.

\*     \*     \*

(f) **[Lender's] Right to Appointment of Receiver. [Lender] or Trustee, as a matter of right and (i) without regard to the sufficiency of the security for repayment of the Debt and without notice to [Borrower], (ii) without any showing of insolvency, fraud, or mismanagement on the part of [Borrower], (iii) without the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, and (iv) without regard to the then value of the Mortgaged Property, shall be entitled to the appointment of a receiver or receivers for the protection, possession, control, management and operation of the Mortgaged Property, including (without limitation), the power to collect the Profits**, enforce this Deed of Trust and, in case of a sale and deficiency, during the full statutory period of redemption (if any), whether there be a redemption or not, as well as during any further times when [Borrower], except for the intervention of such receiver, would be entitled to collection of such Profits. **[Borrower] hereby irrevocably consents to the appointment of a receiver or receivers.** Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters.

\*     \*     \*

FENNEMORE CRAIG, P.C.

PHOENIX

(h) <u>Other Rights</u>. [Lender] . . . (ii) may apply the Impositions and Insurance Reserve and/or any other Reserves held pursuant to this Deed of Trust or the other Loan Documents, and any other funds held by [Lender] toward payment of the Debt; and (iii) shall have and may exercise any and all other rights and remedies which [Lender] may have at law or in equity, or by virtue of any of the Loan Documents, or otherwise." (emphasis added).

## C. THE DEBTOR'S DEFAULTS AND OTHER EVENTS LEADING TO THE RECEIVER'S APPOINTMENT

1. Debtor defaulted on its obligations under the Loan Documents by, among other things: (i) failing to make the Monthly Interest Payments and monthly payments into the Reserves that were due on November 6, 2008, December 8, 2008, January 6, 2009, February 6, 2009, March 6, 2009, and April 6, 2009; and (ii) the occurrence and continuance of an event of default under the Hotel Management Agreement (the "Defaults").

2. As a result of the Defaults, Citigroup accelerated all amounts due under the Loan Documents.

3. The total owed by Debtor under the Loan Documents as of April 15, 2009 is not less than $72,322,677.69 – reflecting: (i) $65,000,000.00 in principal; (ii) accrued interest through May 5, 2009 of not less than $4,149,643.33; (iii) $107,981.61 in late charges; (iv) not less than $363,007.09 for monthly payments owed into the Reserves that were due on November 6, 2008, December 8, 2008, January 6, 2009, February 6, 2009, March 6, 2009, and April 6, 2009 ; and (v) Prepayment Consideration of $2,702,045.66 as of April 14, 2009 (the "**Debt**"), plus all (a) accrued and accruing interest from May 6, 2009, (b) accrued and accruing reserve amounts, and (c) accrued and accruing costs and attorneys' fees incurred by Citigroup in connection with and resulting from the Defaults. Interest is accruing on the principal, Prepayment Consideration and other amounts of the Debt at the rate of 11.572% per annum.

4. Prior to Debtor's filing of this bankruptcy case, Citigroup gave Debtor (and others) notice of the Defaults, and demanded payment of the **Debt** from Debtor. True copies of the default notices given to Debtor and others are attached as **Exhibits 11, 12 and 13** and

FENNEMORE CRAIG, P.C.

PHOENIX

incorporated herein.

5.  Debtor failed to (i) cure the Defaults, and (ii) pay the **Debt**.

6.  On April 14, 2009, Starwood notified the Debtor and Citigroup that, as a result of the Debtor's defaults under the Management Contract, <u>Starwood has terminated the Management Contract effective "at 11:59 p.m. on May 29, 2009</u>" (the "Starwood Notice of Termination"). <u>See</u> **Exhibit 14**. Citigroup is informed and believes that, at or about the same time (April 14), Starwood advised all of its employees at the Wigwam that their employment was terminated as of May 29, 2009.

**D.  THE APPOINTMENT OF THE RECEIVER AND THE RECEIVER'S MANAGEMENT OF THE PROPERTY**

1.  On April 16, 2009, Citigroup filed its Complaint and Application for the Appointment of a Receiver in the State Court.

2.  On April 24, 2009, pursuant to a Stipulation, the State Court signed an Order appointing Douglas Wilson Companies as the Receiver. <u>See</u> **Exhibit 15**.

3.  The Receiver took possession of the Property (including the Wigwam) that same day (April 24), has been overseeing the operation of the Wigwam since that time. By the time the Receiver took possession of the Property, Starwood had already posted WARN Act Notices for its employees. With no replacement operator in line to take over for Starwood, Starwood's notice of termination has created a great amount of uncertainty (compounded by the press coverage of Starwood's WARN Act Notice posting), and employee anxiety has been high.

4.  As a result of Starwood's anticipated exit as manager of the Wigwam, the Receiver engaged in an intensive two-week interview process with twelve prospective operators/managers to find a successor to Starwood. Despite the fact that the Receiver could offer only a short term (90-day) engagement, the Receiver selected Destination Hotels & Resorts ("Destination"), which accepted the short term engagement.[2]

_____

[2] Citigroup understands that the Receiver is in the process of finalizing the contract with Destination, which will be brought to the Court for approval.

FENNEMORE CRAIG, P.C.

PHOENIX

5. Destination is a wholly owned subsidiary of Lowe Enterprises, and is a top seven ranked full-service hotel and resort management company. Destination manages such notable Arizona properties as Royal Palms Resort and Spa and Tempe Mission Palms and Conference Center. Destination's nationwide portfolio includes over 33 assets and 7,500 rooms with properties from Maui, Hawaii to Stowe, Vermont, including the coveted L'Auberge Del Mar and the Estancia La Jolla Hotel & Spa. Also included in Destination's portfolio is the prestigious 582-room Terranea Resort that is situated on 102 oceanfront acres on the Palos Verdes Peninsula in Southern California and features a 25,000-square-foot destination spa, three swimming pools, three restaurants and a Todd Eckenrode-designed par three golf course.

6. The Receiver and Citigroup are informed and believe that transitioning operation/management of the Wigwam, a 331-room resort with associated golf, food and beverage, recreation, and retail operations, from an operator such as Starwood would typically be a 30 to 40-day process.

7. Upon takeover of the Wigwam, the Receiver learned that because of Starwood's anticipated exit, numerous groups had provided notice of cancellation of their future business with the Wigwam. As a result, the Receiver reached out to the Wigwam's group customers to attempt to avoid their cancellations, and thus preserve the value of the group business.

8. The Receiver understands that the Wigwam is important to the City of Litchfield Park, and the property provides significant support to the community via its property tax and sales and use tax revenues.

**E. TURNOVER OF THE PROPERTY WILL CAUSE SIGNIFICANT HARM TO CITIGROUP AND THE BANKRUPTCY ESTATE**

1. As set forth above, at 11:59 p.m. on Friday, May 29, 2009, Starwood will be departing the Wigwam, and taking with it all of its proprietary data, licenses, systems and materials. The Wigwam's personnel (who are imperative to the ongoing operation of the Wigwam) will also be terminated at that time. Certain of the proprietary data, licenses,

systems and materials are also imperative to the ongoing operation of the Wigwam. Some of the most imperative licenses, systems, and materials include but are not limited to the following:

a. Microsoft (Operating System) Licensing;

b. Property Management System;

c. Reservations System;

d. Point of Sale and 'Back of the House' Accounting System;

e. Human Resource Files; and

f. Room Keys

2. If no "replacement" operator/manager is in place at 12:00 am on Saturday, May 30, 2009, with the wherewithal, infrastructure and competency to transition and operate (among other things) the licenses, systems, materials and personnel, the Wigwam will not be able to operate uninterrupted upon Starwood's exit.

3. On Tuesday, May 19, 2009, Destination commenced the transition process in order to be in a position to take over the Wigwam immediately upon Starwood's departure. With the commitment of resources provided by Destination in the truncated transition time available, it is expected that the transition can be successfully completed such that the Wigwam continues to operate without interruption as of midnight on Saturday, May 30, 2009.

4. One of the priorities in the transition process is the human resource matters. Destination is currently rehiring Starwood's Wigwam employees. The necessary information technology, accounting and other operational transitions are also underway.

5. On Monday, May 25, 2009 (Memorial Day), counsel for Citigroup had multiple telephone conferences with the Debtor's counsel. Based on those conversations, Citigroup is informed and believes that the Debtor does not have a management team in place to transition operation of the Wigwam when Starwood leaves the Wigwam at 11:59 on Friday, May 29. Although the Debtor purports to be "interviewing" an individual candidate for the general manager position, with Starwood's departure less than four days

FENNEMORE CRAIG, P.C.

PHOENIX

away, there is absolutely no assurance that he will take the position. Moreover, even if he did, there is no evidence that he: (i) is qualified to operate the Property; (ii) has the wherewithal to retain Starwood's Wigwam employees, who are critical to a successful transition; and (iii) can provide access to a reservation network of the type necessary for a luxury destination resort property like the Wigwam.

6. Citigroup does not consent to the Debtor's use of its cash collateral. In this regard, contemporaneously with filing this Motion, Citigroup is filing its "(1) Notice of Nonconsent to Debtor's Use of Cash Collateral; (2) Demand for Sequestration and Accounting; and (3) Motion to Compel Turnover of Cash Collateral". The Debtor has not filed a motion for permission to use Citigroup's cash collateral.[3] Moreover, even if it did, the Debtor will not be able to show that Citigroup's interest in the cash collateral is adequately protected--a condition that is necessary before the Court can authorize the Debtor's use of cash collateral.

7. Citigroup is informed and believes that there will be a shortfall of cash necessary to continue operating the Wigwam. Based on the representations of the Debtor's counsel on May 25, 2009, Citigroup is informed and believes that the Debtor does not have debtor in possession financing arranged to fund all of the necessary operating expenses.

## II. **THE INTERESTS CREDITORS WOULD BE BETTER SERVED BY PERMITTING THE RECEIVER TO CONTINUE IN POSSESSION, CUSTODY AND CONTROL OF THE PROPERTY.**

Pursuant to 11 U.S.C. § 543(d)(1), the Court "may excuse compliance with [a custodian's obligation to turnover estate property] if the interests of the creditors . . . would be better served by permitting a custodian to continue in possession, custody, or control of such property". Under Section 543(d)(1), the Court has the discretion to allow a State-Court appointed receiver to remain in possession, custody or control of estate property. See In re Uno Broadcasting Corporation, 167 B.R. 189, 200 (Bankr. D.Ariz. 1994). As shown below, under the facts of this case, the Court clearly should exercise its discretion to allow the Receiver to remain in possession, custody and control of the

---

[3] In fact, the Debtor has not filed any "first day" motions whatsoever.

Property.

In re Uno Broadcasting Corporation, supra, is a case on point. There, the secured creditor (like Citigroup) obtained the appointment of a receiver to take over control of the creditor's collateral before the bankruptcy was filed. After the bankruptcy was filed, the creditor filed a motion asking the Bankruptcy Court to excuse the receiver's obligation to turnover possession of the property to the debtor. The Bankruptcy Court (Judge Case) found that the interest of creditors would be better served by excusing the receiver's obligation to turnover possession of the property to the debtor. The Court's reasoning is instructive and applies in our case:

> "Section 543(d) cases are fact intensive, turning upon whether the assets of the particular debtor should be administered by the existing custodian or returned to the debtor. . . . Courts consider factors including whether there will be sufficient income to fund a successful reorganization and whether there has been mismanagement by the debtor. . . .
>
> In this case, it is not difficult to conclude that the assets of the Debtor should remain in the hands of the Receiver. **The evidence suggests that the Receiver has been proceeding expeditiously and professionally to manage the affairs of the Debtor.** The Receiver has begun to deal with seriously delinquent obligations to the Internal Revenue Service, has reorganized management, has implemented accounting controls, has contacted and dealt with numerous vendors and has taken certain personnel actions. The Receiver has experience in the broadcast industry, although by his own admission, is 'not an expert' at broadcast station management. Nonetheless, this Court is satisfied, as was the District Court, that **the Receiver is proceeding appropriately and expeditiously in handling the affairs of the estate**.
>
> **The Debtor offers no serious alternative**. Mr. Tezak, sole shareholder of the Debtor and the person previously in charge of the operations of the Debtor, is unable to manage the business at this time, as he is in prison. His wife, Mrs. Tezak, to whom he has given a Power of Attorney, admittedly has no experience in the broadcast industry and no substantial general business experience. She proposes to engage Mr. Stephen Clarke, an experienced management consultant, but the scope of his proposed duties are not well-defined. Mr. Clarke would not assume the position of Chief Executive or Chief Operating Officer of the Debtor; rather, he would 'advise' and 'consult with' Mrs. Tezak as the need arises. **This informal arrangement is insufficient to provide a suitable management team for the Debtor for the protection of the interests of creditors.**
>
> **The interests of creditors would similarly be disserved by costs necessarily incurred in displacing Mr. Friedman. <u>Unlike the typical situation, in which a custodian would return assets to preexisting management, the custodian here would be required to turnover the assets to yet another third party. There would undoubtedly be substantial disruption, duplication, costs, and confusion arising out of another management change at this point</u>**. The Debtor did not propose that Mr. Clarke replace Mr. Friedman;

FENNEMORE CRAIG, P.C.

PHOENIX

even if this, more specific, arrangement were proposed, the Court would have been disinclined to remove Mr. Friedman. While Mr. Clarke is experienced and capable, **the Debtor did not persuade the Court that the attendant costs would serve the interests of creditors**." Id. at 200-01 (citations omitted) (emphasis added).

In our case, as in Uno Broadcasting, the Debtor does not propose that the Receiver turnover possession of the Property so that the pre-existing management can be restored. As shown above, Starwood has terminated the Management Contract and is leaving the Wigwam effective at 11:59 p.m. on Friday, May 29, 2009. The Receiver (like the receiver in Uno Broadcasting) already has made arrangements to replace Starwood with Destination, another qualified property manager that already is in place and has made arrangements to retain Starwood's Wigwam employees so that an orderly transition can take place. As in Uno Broadcasting, there would be "substantial disruption, duplication, costs, and confusion" caused by the Receiver turning the Property over to the Debtor so that is can have another manager--who has not even been hired yet--to operate the Property.

The bottom line is that the interests of creditors would be better served by allowing the Receiver to remain in possession, custody and control of the Property. Accordingly, Citigroup respectfully asks the Court to: (i) excuse the Receiver from its obligation under 11 U.S.C. § 543 to turnover possession, custody and control of the Property to the Debtor; and (ii) allow the Receiver to finalize the contract with Destination and continue performing all of the Receiver's obligations under the Receivership Order.

**III. <u>CONCLUSION</u>**

As shown above, the interests of the creditors would be better served by allowing the Receiver to remain in possession, custody and control of the Property. Accordingly, Citigroup respectfully asks the Court to: (i) excuse the Receiver from its obligation under 11 U.S.C. § 543 to turnover possession, custody and control of the Property to the Debtor; and (ii) allow the Receiver to finalize the contract with Destination and continue performing all of the Receiver's obligations under the Receivership Order.

RESPECTFULLY SUBMITTED:  May 26, 2009.

FENNEMORE CRAIG, P.C.

By  /s/ Dewain D. Fox #014431
David A. Weatherwax
Dewain D. Fox
Attorneys for Citigroup Global Markets
Realty Corp.

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David Wm. Engelman, Esq.
ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
Attorneys for Debtor

I hereby certify that on May 26, 2009, I electronically transmitted the attached document by e-mail to the following:

Donald F. Ennis, Esq.
SNELL & WILMER, LLP
One Arizona Center
400 East Van Buren
Phoenix, Arizona 85004-2202
Attorneys for Douglas Wilson Companies, Receiver

 /s/ Kelly White
2200125.3

FENNEMORE CRAIG, P.C.

PHOENIX