SCOTT H. McNUTT (CSBN 104696)
MICHAEL A. SWEET (CSBN 184345)
MARIANNE M. DICKSON (CSBN 249737)
**McNUTT LAW GROUP LLP**
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487
Email: smcnutt@ml-sf.com
Email: msweet@ml-sf.com
Email: mdickson@ml-sf.com

Attorneys for Kabuto Arizona Properties, LLC

DAVID WM. ENGELMAN, SBA #004193
SCOTT B. COHEN, SBA #014377
PATRICK A. CLISHAM, SBA #023154
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE
SUITE 700
PHOENIX, ARIZONA 85012
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: dwe@engelmanberger.com
Email: sbc@engelmanberger.com
Email: pac@engelmanberger.com

Attorneys for Kabuto Arizona Properties, LLC

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| KABUTO ARIZONA PROPERTIES, LLC, | Case No. 2:09-bk-11282-GBN |
| EIN 26-0231294 | **DEBTOR'S MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND CERTAIN ASSETS OF THE DEBTOR'S AFFILIATES AS A GOING CONCERN AND TO ASSUME AND ASSIGN OR REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO** |
| Debtor. | |

Pursuant to 11 U.S.C. §§ 105(a), 363 and 365, Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007, and 9014, and Local Rules 6004-1 and 6006-1, Kabuto Arizona Properties, LLC (the "Debtor") hereby requests that this Court enter an Order authorizing (i) the sale (the "Sale") of substantially all of the Debtor's assets, and certain assets of affiliates delineated hereafter, free and clear of liens, claims and interests except as herein provided, and (ii) authorizing the assumption and assignment or

rejection, as applicable, of related executory contracts and unexpired leases. The relief requested in this motion (the "Motion") is summarized as follows:

### The Debtor's Need to Sell

(1) The Debtor and certain of its non-debtor affiliates, Kabuto Properties Company II ("KPC II"), KSK Property Management, Inc. ("KSK"), Kabuto Arizona Properties, L.L.C., an Arizona limited liability company, and Kabuto Investments, LLC, (together "Kabuto Investments"), and Golf Solutions Arizona, L.L.C. ("GSA" and, with KPC II, KSK and Kabuto Investments, the "Affiliates"), own and/or operate the Wigwam Golf Resort and Spa in Litchfield Park, Arizona, including three eighteen hole golf courses, including a non-contiguous real estate parcel known as "Sunset Point" (together, the "Resort"), and two eighteen hole golf courses located at the Arizona Biltmore Country Club in Phoenix, Arizona (the "Biltmore Courses" and, together with the Resort, the "Properties"). In connection with such ownership and operation, the Debtor and/or an Affiliate are parties to certain executory contracts or unexpired leases important to such ownership and operation.

(2) The Debtor filed this chapter 11 bankruptcy case (the "Case") on May 22, 2009, intending to continue its business and restructure its secured and unsecured obligations through the chapter 11 reorganization process. Since that time, the Debtor has continued to operate its business as a debtor-in-possession through the use of cash collateral with the consent of its secured lender, Citigroup Global Markets Realty Corp. ("Citigroup"), and as approved by the Bankruptcy Court.

(3) The Debtor has since pursued two alternative routes to reorganization, including (1) seeking postpetition financing to support its ongoing operations and fund a plan of reorganization, and (2) marketing the Offered Assets (as hereafter defined in paragraph 25(4)) for sale as a going concern in order to fund a plan of liquidation. During this time, however, economic conditions facing the Debtor have worsened and the frozen credit markets have failed to thaw. The Debtor has incurred and projects that it will continue to incur significant budget shortfalls for which the Debtor has not been able to obtain additional funding. Accordingly, it has become clear that the Debtor will not be able to obtain adequate financing to reorganize and must sell the Offered Assets.

(4) In light of these concerns, the Debtor and Citigroup stipulated to the entry of an Order whereby the automatic stay terminated without further Order of this Court, because the Debtor failed to obtain a final Order from the Court authorizing the Debtor to sell the Offered Assets prior to 5:00 p.m. MST on October 22, 2009.

### Interests in the Offered Assets

(5) Citigroup is the holder of a promissory note by the Debtor in the principal amount of $65,000,000 (the "Note"). The Note is secured by a contemporaneously executed Security Agreement and duly recorded and filed Deeds of Trust and a UCC-1 Financing Statement which, except as set out below, gave Citigroup a properly perfected, first priority lien against (among other things) the Properties other than Sunset Point (collectively, the "Citi Security Agreements" and, with the Note, all other documents executed pursuant thereto or in connection therewith, and all amounts due thereunder or with respect thereto, the "Citi Loan").

(6)  In addition to Citigroup, there are certain other parties that do or may assert a security interest in or other interest with respect to certain of the Offered Assets owned by the Debtor (the "Debtor Offered Assets"), including West Valley National Bank ("WVNB"), General Electric Capital Corp. ("GE"), John Deere Credit, Inc. ("John Deere"), FreshPoint Arizona, Inc. ("FreshPoint"), Biltmore Hotel Partners ("BHP"), and Douglas Wilson Companies ("DWC") (collectively, with any other creditor claiming an Interest in any of the Debtor Offered Assets, the "Other Debtor Secured Creditors"). On information and belief, WVNB and GE assert security interests in certain mechanical structures located at the Resort and the Golf Facilities (as defined below), John Deere asserts a security interest in certain golf course equipment (the "John Deere Equipment"), FreshPoint asserts a PACA (as hereinafter defined) trust right in the Debtor's property, BHP asserts a right of first refusal to purchase the Biltmore Courses, and DWC asserts a judicial lien on all of the Debtor Offered Assets for payment of its and its counsel's fees and expenses allowed by the Court's September 18, 2009 Order (the "DWC Fees and Expenses").

(7)  Certain parties (the "Affiliate Secured Creditors") also assert security interests in certain of the Offered Assets that are owned by an Affiliate (the "Affiliate Offered Assets").

(8)  On information and belief, Citigroup: (i) asserts a security interest senior to those of WVNB and GE; (ii) disputes the validity and extent of WVNB's and GE's security interests in the Properties; and (iii) reserves the right to challenge the validity, extent and priority of all other alleged security interests held by the Other Debtor Secured Creditors in the Debtor Offered Assets.

(9)  The Debtor anticipates that the Other Debtor Secured Creditors will not oppose the Sale on the terms provided herein. In the event that any of such parties oppose the Sale, however, the Debtor shall request approval of the Sale free and clear of the liens and claims of such parties either (i) pursuant to 11 U.S.C. § 363(f)(4) and/or (5), or (ii) by funding the Claims Escrow (as hereinafter defined).

(10) The Debtor further anticipates that the claims of the Affiliate Secured Creditors in the Affiliate Offered Assets to which the Lender Purchaser elects to take title shall be brought current by Citigroup and then assumed by the Lender Purchaser (as hereinafter defined).

## Sale of the Offered Assets

(11) For more than a year, the Debtor has been actively marketing the Offered Assets for sale. Despite the Debtor's best efforts and substantial interest expressed by third parties, the Debtor has been unable to secure a purchase contract for the Offered Assets.

(12) As a result, the Debtor and the Affiliates[1] (the "Selling Entities"), in their considered business judgment, have agreed to sell the Offered Assets, and assign the agreements listed on **Exhibit 1** (the "Agreements"), to Citigroup or, if it closes on a purchase of the Citi Loan, to JDM Partners, LLC, or its assignee or assignees ("JDM"), Citigroup's contract vendee for the Citi Loan (Citigroup or its designee or designees, or JDM or its designee or designees, as applicable, the "Lender Purchaser"), subject to the terms and conditions provided herein and subject to better and higher offers at an auction (the "Auction") conducted pursuant to the procedures described in the <u>Debtor's Expedited</u>

---

[1]  The Affiliates consent to the Court's jurisdiction to sell their interest in the Offered Assets as evidenced by the Declaration of Kun Sam Kim attached hereto as **Exhibit 5**.

<u>Motion For (1) Authority To Conduct Auction Of The Debtor's Assets As A Going Concern, (2) Approval Of Bidding Procedures, and (3) Approval of Expedited Procedures for Assuming and Assigning, or Rejecting, Executory Contracts and Unexpired Leases Related Thereto</u> (the "Procedures Motion"), which has been filed contemporaneously herewith.

(13) Among other things, the Selling Entities have agreed to sell the Offered Assets and assign the Agreements to the Lender Purchaser for (collectively, the "Lender Bid"): (i) $45,000,000, to be paid in the form of a credit bid for the Offered Assets; (ii) in accordance with paragraph 25(7) below, the cure of any monetary defaults under (a) the secured claims of the Affiliate Secured Creditors in the Affiliate Offered Assets to which the Lender Purchaser (as hereinafter defined) elects to take title, and (b) the Agreements of which the Lender Purchaser elects to take an assignment, and (iii) the assumption of post-closing liabilities (the "Assumed Liabilities") arising with respect to the Agreements of which the Lender Purchaser elects to take an assignment. For the avoidance of doubt, the Lender Purchaser is not assuming any post-closing obligations owed to any Affiliate Secured Creditor, whether or not title to any Offered Asset will be transferred under and subject to the secured claim of such Affiliate Secured Creditor.

(14) The Debtor requests (i) that the Offered Assets be sold free and clear of all liens, claims, interests and encumbrances of any kind or nature whatsoever (collectively, the "Interests") except for (1) the items set forth on **Exhibit 2**, (2) the liens held by any Affiliate Secured Creditor in an Affiliate Offered Asset to which the Lender Purchaser takes title, and (3) except as set forth below, the first-priority lien of the Citi Security Agreements on the Debtor's Personal Property (as hereinafter defined) to secure the balance of the Citi Loan after deducting the amount of the credit bid portion of the Lender Bid (the liens, claims and encumbrances under clauses (1)-(3) above are referred to collectively as the "Permitted Encumbrances") and (ii) that the Court enter an injunction (the "Injunction") barring the assertion against the Lender Purchaser of any and all claims of any kind or nature against the Debtor or the Debtor's estate (the "Claims"), other than the Assumed Liabilities. In the event that the Lender Purchaser is not the successful bidder at the Auction, then any and all Interests on or against the Debtor Offered Assets will transfer to the proceeds of the Sale, and there shall be no survival of any lien under the Citi Security Agreements.

### Assumption and Assignment, or Rejection, of Executory Contracts

(15) The Sale contemplates the assumption and assignment of the Agreements to which the Debtor is a party (the "Debtor Agreements"), the rejection of all other executory contracts or unexpired leases to which the Debtor is a party (the "Other Contracts"), and the assignment of the Agreements to which an Affiliate is a party (the "Affiliate Agreements").

(16) The proposed procedures for the assumption and assignment, or rejection, as applicable, of the Debtor Agreements and the Other Contracts are set forth in the Procedures Motion.

This Motion is supported by the following Memorandum of Points and Authorities, the Procedures Motion filed concurrently herewith, the Declaration of Kun Sam Kim attached hereto as **Exhibit 5**, and the papers and pleadings on file in the Case, all of which are incorporated herein by this reference.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    BACKGROUND

1.    On May 22, 2009, the Debtor filed its voluntary petition under chapter 11 of Title 11 of the U.S. Code, thereby commencing the Case.

2.    This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).

### A.    THE DEBTOR'S ORGANIZATIONAL STRUCTURE

3.    The Debtor is a Delaware limited liability company with its principal place of business in Litchfield Park, Arizona.

4.    The Debtor's sole member is KPC II.  KPC II is a Delaware limited liability company with its principal place of business in San Francisco, California.  Kun Sam Kim ("Kim") is the sole member of KPC II.

5.    Kim is also the sole shareholder and director of KSK, a California corporation.  KSK is the sole member of GSA, an Arizona limited liability company.

### B.    THE DEBTOR'S BUSINESS OPERATIONS AND KNOWN INTERESTS ASSERTED IN THE DEBTOR'S OFFERED ASSETS

### i.    Overview of the Offered Assets

6.    The Resort includes, among other things, 331 hotel guest rooms (including 72 luxury suites), 43,000 square feet of meeting and ballroom space, a Red Door Spa operated by Elizabeth Arden, nine illuminated tennis courts, three pools, three restaurants, a country club and three eighteen-hole golf courses (collectively, the "Wigwam Courses").

7.    In addition to the Resort, the Debtor is also the owner of the Biltmore Courses located at the Arizona Biltmore Country Club on 2400 East Missouri Avenue, Phoenix, Arizona 85016.  The Wigwam Courses and the Biltmore Courses are referred to collectively hereafter as the "Golf Facilities."

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

8.     The Selling Entities also own personal property (the "Personal Property") that is related to and/or used in connection with the operation of the Properties, including:   (i) hotel goods, machinery, vehicles, furniture, fixtures and equipment; (ii) golf course goods, machinery, vehicles, furniture, fixtures and equipment; (iii) general food and beverage and merchandise inventory for the hotel and golf courses; and (iv) intangible property; which includes, but is not limited to, the items set out on **Exhibit 3**.  The Personal Property that constitutes the Affiliate Offered Assets is so identified on such Exhibit.

### iii.     Overview of the Agreements

9.     As set forth above, certain Agreements are necessary to the successful operation of the Properties, including, without limitation, water rights agreements.  The Debtor is a party to certain of such Agreements, and an Affiliate is party to certain other of such Agreements.  The Debtor's and the Lender Purchaser's present understanding of the list of Agreements is set forth on **Exhibit 1.**  This list is subject to revision.  Those Agreements that constitute Affiliate Agreements are so identified on such **Exhibit 1**.

### iv.     Citigroup's Loan and Security Interests

10.     On June 12, 2007, the Debtor entered into a "Loan and Security Agreement" (the "Citi Loan Agreement") with Citigroup pursuant to which Citigroup agreed to loan to Debtor the principal sum of $65,000,000.

11.     The Citi Loan Agreement is evidenced by the Note executed by the Debtor in favor of Citigroup.  The Note is secured by, among other things, first-position deeds of trust on the real properties owned by the Debtor, other than Sunset Point, and first-position blanket security interests in all of the Debtor's and certain of the Affiliates' Personal Property as more fully set forth in the Citi Security Agreements.

12.     As of the Petition Date, the principal balance of the Citi Loan was approximately $65,000,000, plus applicable interest, fees, late charges, reserves, and other charges.  On September 8, 2009, Citigroup filed a Proof of Claim (Claim No. 145) in the amount of $73,269,029.77 as of the Petition Date ("Citigroup's Claim").  No objection to Citigroup's Claim has been filed.

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

### iv. WVNB's Loan and Security Interests

13.     On or about May 19, 2008, the Resort's cooling tower and chiller (the "Chiller") failed. In order to finance the replacement of the Chiller, Kim personally obtained a loan from WVNB in the amount of $388,235.00 (the "WVNB Loan"), as evidenced by a Promissory Note of that same date. The WVNB Loan was secured by a contemporaneously executed Commercial Security Agreement whereby Kim granted WVNB a security interest in the Chiller. WVNB subsequently filed a UCC-1 Financing Statement.

14.     Thereafter, the Chiller was installed at the Resort, with the Debtor funding all payments required under the agreements evidencing the WVNB Loan.

15.     It is the Debtor's position that, notwithstanding Kim's purchase and financing of the Chiller, the Chiller is an asset of the estate. Moreover, on information and belief, Citigroup asserts a senior security interest in the Chiller and disputes the validity and priority of any security interest WVNB may assert in the Chiller.

16.     As of September 28, 2009, the balance due and owing on the WVNB Loan was $223,430.01.

### v. FreshPoint's PACA Trust Right

17.     FreshPoint is a vendor of fresh produce to the Debtor's restaurant and food and beverage operations. FreshPoint has not been paid for $50,055 of pre-petition deliveries of fresh produce to the Debtor's operations. Under the Perishable Agricultural Commodities Act ("PACA"), which provides extraordinary protections to vendors of fresh produce as a matter of public policy, FreshPoint claims a property interest in the Debtor's assets – as proceeds of the commodities, such proceeds having been commingled with the Debtor's other assets – as beneficiary of a federally-mandated statutory trust. 7 U.S.C. § 499e(c). This trust right is alleged to be prior to all other interests, including secured claims such as that of Citigroup in the Debtor's property.

### vi. BHP's Right of First Refusal

18.     BHP, as successor in interest to Rostland Arizona, Inc., asserts a right of first refusal to purchase the Biltmore Courses from the Debtor pursuant to the Replacement Golf and Maintenance

Privilege Agreement dated May 29, 1980 (the "BHP Agreement"). The Debtor reserves the right to argue that the BHP Agreement does not create an Interest in any Offered Asset, and/or is subject to rejection under 11 U.S.C. § 365 as an executory contract in whole or in part.

### vii.  GE's And John Deere's Claims and Security Interests

19.  On or about October 10, 2007, the Debtor executed a Loan and Security Agreement in favor of GE (the "GE Loan") in order to finance the purchase of an irrigation pump station and telephone computer network system (the "Telephone System") that were subsequently installed at the Biltmore Courses (collectively, the "GE Equipment"). GE subsequently filed a UCC-1 Financing Statement with respect to the GE Equipment with the Delaware Secretary of State. The current balance due to GE under the terms of the GE Loan is approximately $84,486.65.[2]

20.  On information and belief, Citigroup takes the position that: (i) upon installation, the GE Equipment became an accession to the Debtor's real property, with respect to which Citigroup holds a first priority lien under the Citi Security Agreements; (ii) GE failed to perfect its security interest in the Telephone System; and (iii) GE failed to perfect its interest in the other GE Equipment timely, causing, GE's security interest in the GE Equipment to be at best junior in priority to Citigroup's liens and security interests under the Citi Security Agreements.

21.  John Deere has asserted a secured claim against the John Deere Equipment in the amount of $5,300.63.

### viii.  DWC Judicial Lien

22.  DWC asserts a judicial lien on substantially all of the Debtor Offered Assets, senior to all other Interests in such assets, to secure the DWC Fees and Expenses. The DWC Fees and Expenses are in the amount of $329,088.50 for DWC, and $125,848.23 for DWC's counsel. Citigroup disputes that DWC has a lien against substantially all of the Debtor Offered Assets.

## II.  SALE OF THE OFFERED ASSETS/ASSIGNMENT OF THE AGREEMENTS

---

[2]  GE has recently filed a motion seeking relief from the automatic stay with respect to the GE Loan and GE Equipment. *See* Dkt. 171.

23. The Debtor, together with the Affiliates, requests authority to sell the Offered Assets, free and clear of all Interests other than Permitted Encumbrances and, pursuant to the Injunction, all Claims other than the Assumed Liabilities. As referenced above, the Debtor has undertaken to market the Offered Assets for sale as a going concern. Specifically, for more than a year, the Debtor has been actively soliciting bids for a possible sale of some or all of the Offered Assets as a going concern. The Debtor's efforts in this regard have included the direct marketing of the Offered Assets and solicitation of purchase offers from resort investor groups and local business interests. For the past several months, the Debtor has engaged in increased efforts to sell the Offered Assets, including several lengthy negotiations with potential purchasers and investors that resulted in the negotiation of at least two letters of intent and asset purchase agreements.

24. Notwithstanding such efforts, however, the Debtor has been unable to secure a purchase contract for the Offered Assets on terms that are more favorable than those proposed herein. Nevertheless, the Debtor intends, as set forth in the Procedures Motion, to provide publication notice of the proposed Sale, and to provide notice by mail of the proposed Sale to all parties that have previously expressed an interest in, or who are believed to be interested in, the Offered Assets.

**A.     TERMS OF THE SALE TO THE LENDER PURCHASER**

25. Subject to Court approval and better and higher offers made at the Auction, the Selling Entities have agreed to sell the Offered Assets to the Lender Purchaser on the following terms:

(1)     The Lender Purchaser will purchase for the Lender Bid the Offered Assets free and clear of all Interests other than the Permitted Encumbrances.

(2)     As additional consideration for the Debtor's presentation of this Motion, Citigroup has agreed to waive its security interests and claims as to fifty percent (50%) of all proceeds, net of attorneys' fees and costs, obtained by the Debtor in its pending claims against Starwood Hotels & Resorts Management Company, Inc. and DWC in Adv. No. 09-00956 (the "Starwood Claims"), and convey those proceeds to the estate. Provided that the Court approves a Sale pursuant to this Motion and such a Sale timely closes, such consideration is irrevocable and shall inure to the benefit of the Debtor's estate, regardless of whether or not the Lender Bid is the Winning Bid at the Auction.

(3)     While Citigroup does not expect to credit bid the full amount of the Citi Loan as part of the Lender Bid, Citigroup on behalf of the Lender Purchaser may, in its sole discretion, increase the credit bid portion of the Lender Bid for the Offered Assets up to a maximum amount of $55,000,000.

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

(4)    In consideration for the Lender Bid, the Selling Entities will convey to the Lender Purchaser the following assets (collectively, the "Offered Assets"):

i.    All of the Selling Entities' interests in the Properties, including (without limitation) all of the Selling Entities' real property interests in the Resort, the Golf Facilities, and all buildings, facilities and other structures and improvements located on such real property, all rights and privileges pertaining to such real property or to any of such structures and improvements, and all fixtures, installations, machinery, equipment and other property and appurtenances related thereto, and all appurtenances related to the Resort and the Golf Facilities as more particularly described in the Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing, dated as of June 12, 2007, and recorded as document number 2007-0679049 in the Official Records of Maricopa County, Arizona;

ii.    All of the Personal Property, including (without limitation) the items set forth on **Exhibit 3;**

iii.    All cash and all cash equivalents in whatever form, and deposit accounts, including, without limitation, utility deposit accounts, and cash or cash equivalent items set out in subparts viii, x, and xiii below, and including those held in the name of GSA (collectively, the "Debtor's Cash"), subject to the provisions of Paragraphs 25(7) and 26 hereto.

iv.    All of the Selling Entities' intangible property that is related to and/or used in connection with the operation of the Offered Assets, including (without limitation), all registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Offered Assets), all domain names, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the patents), and all industrial designs, owned by the Selling Entities, and any registrations and applications therefor, and all databases, design databases, schematics and data collections and all rights therein owned by any Selling Entity;

v.    Any and all contracts, leases, and/or exchange agreements for the water supply (i.e., groundwater, Type 2 certificated rights, effluent, Central Arizona Project or Salt River Project water), and for the delivery of the water supply (i.e., infrastructure, canals, wells, pipelines, storage tanks or other existing delivery facilities), existing as of the date of this Motion, including (without limitation) those contracts, leases and/or exchange agreements set forth on **Exhibit 1**;

vi.    All licenses, permits and other authorizations that are related to and/or used in the operation of the Offered Assets, including (without limitation) Alcoholic Beverage License Nos. 06070419 and 06070124 issued by the Arizona Department of Liquor Licenses and Control, all certificates of occupancy, and all pending applications for liquor licenses and other licenses, permits and authorizations;

vii. The Agreements and the Selling Entities' interests in such other and further executory contracts and leases as may be identified by the Lender Purchaser, and assumed and assigned, if such agreements are with the Debtor pursuant to the procedures set forth in the Procedures Motion;

viii. All accounts receivable and all notes and other receivables of every kind or character that are related to the operation of the Offered Assets, and any instruments evidencing the foregoing;

ix. All telephone and facsimile numbers used in connection with the operation of the Offered Assets;

x. All bank accounts and lockbox arrangements benefiting the Offered Assets;

xi. All financial books, accounting records, files, lists, publications, and other records and data relating to the operation of the Offered Assets, including (without limitation) all guest and other customer lists of the Properties, regardless of the medium on which such information is stored or maintained;

xii. All goodwill of the Selling Entities relating to the Offered Assets;

xiii. All credits, prepaid expenses, deferred charges, deposits and advance payments owned or held in connection with the operation of the Offered Assets, including (without limitation) guest room, meeting facility, customer, permittee or other deposits; and

xiv. Any and all other assets necessary for the continued operation of the Offered Assets after the closing of the Sale in the same manner as conducted by the Debtor and its affiliates (including, without limitation, the Affiliates) prior to the Sale;

(5) The Sale to the Lender Purchaser is subject to any better and higher offers from other Qualified Bidders at the Auction, to be conducted by the Court;

(6) Closing of the Sale shall occur within three business days after the Sale Order (as hereinafter defined) becomes effective;

(7) If the Lender Bid is the Winning Bid at the Auction, then

a. (i) all Cure Amounts (defined below), (ii) all monetary arrearages under the Affiliate Contracts through the closing of the Sale (the "Closing"), and (iii) all monetary arrearages under the claims of the Affiliate Secured Creditors through the Closing (but excluding any amounts that are due as a result of any acceleration of such claims that might have occurred) will be paid at the Closing, first out of the Debtor's Cash and then, to the extent of any insufficiency thereof, by Citigroup,

b. to the extent any Other Debtor Secured Creditor other than DWC does not consent to the Sale or the Interest of such creditor cannot otherwise be removed pursuant to 11 U.S.C. § 363(f)(4) and/or (5), then the alleged amount of such creditor's secured claim shall be deposited in an escrow account (the "Claims Escrow"), first, out of the Debtor's Cash, to the extent

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

thereof, up to the amount of any arrearages under such claim through the Closing (but excluding any amounts that are due as a result of any acceleration of such claims that might have occurred), second, by Citigroup, up to the amount of any arrearages under such claim through the Closing (but excluding any amounts that are due as a result of any acceleration of such claims that might have occurred), and third, by the Lender Purchaser up to the balance thereof, and

c. the amount of the DWC Fees and Expenses shall be deposited in the Claims Escrow at the Closing, first out of Debtor's Cash and then, to the extent of any insufficiency thereof, by Citigroup.

No amount shall be disbursed from the Claims Escrow with respect to any Other Debtor Secured Creditor except upon (i) Order of this Court, or (ii) the consent of the contributors to the Claims Escrow on account of such creditor. Amounts left in the Claims Escrow with respect to any Other Debtor Secured Creditor after payment or other satisfaction of all amounts due or determined to be due to such creditor shall be returned to the contributors to the Claims Escrow on account of such creditor pro rata, based upon the amounts of their respective contributions;

(8) The Sale must be approved by a final Order (the "Sale Order") in the form attached as **Exhibit 4**, the terms of which are incorporated in this Motion, which Sale Order shall not be amended, modified or otherwise affected in any way by the terms of any plan of reorganization or liquidation, or any Order of this Court confirming any such plan without the Lender Purchaser's consent;

(9) The Lender Purchaser shall not be obligated to close the Sale in the event that (i) the Selling Entities are unable at Closing to deliver title to or a valid assignment or transfer of any of the Offered Assets, free and clear of all Interests other than Permitted Encumbrances, (ii) this Court does not approve the assumption and assignment of the Debtor's Agreements or the rejection of the Other Contracts, or (iii) the Affiliates are unable to obtain any consents and approvals necessary for the assignment to the Lender Purchaser of any Affiliate Agreement; and

(10) The Lender Purchaser, at the Closing, may decline in its sole discretion to take title to any Offered Asset, or an assignment of any Agreement, so long as no deduction is taken from the amount of the credit portion of the Lender Bid as a result thereof.

26. Notwithstanding anything to the contrary in paragraph 25(4), at Closing the following shall be distributed to Citigroup: the balance of the Debtor's Cash (after the uses set forth in paragraph 25(7) above); all accounts receivable and all notes and other receivables of every kind or character that are related to the operation of the Offered Assets; all bank accounts and lockbox arrangements benefiting the Offered Assets and any instruments evidencing the foregoing; all credits, prepaid expenses, deferred charges, all deposits and advance payments owned or held in connection

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

with the operation of the Offered Assets; and all utility and other deposit accounts, and all reserves held by or for the benefit of Citigroup in connection with the Citi Loan.

27. The Lender Bid and all of the terms and conditions thereof, have been negotiated at arms-length, and in good faith, by the Debtor, Citigroup, and JDM, and the Debtor intends to request a finding that the Lender Purchaser acted in good faith within the meaning of 11 U.S.C. § 363(m) and is consequently entitled to all of its protections.

**B.    BIDDING PROCEDURES**

28. As described more fully in the Procedures Motion, the Debtor requests authority to offer the Offered Assets for sale at the Auction, to be held by the Court immediately prior to its final hearing on this Motion (the "Sale Hearing").

29. Upon the Auction's conclusion, the Debtor, in consultation with its advisors, will identify the highest and otherwise best offer for the Offered Assets (the "Winning Bid"). At the Sale Hearing, the Debtor shall present the Winning Bid to this Court for authorization to consummate a sale of the Offered Assets to the winning bidder in accordance with the Winning Bid.

**C.    THE AGREEMENTS**

30. As part of the Procedures Motion, the Debtor requested approval of certain procedures for assuming and assigning, or rejecting as applicable, the Debtor Agreements and the Other Contracts (collectively, the "Executory Contract Procedures").

31. Subject to compliance with the Executory Contract Procedures, and to payment of any amounts determined by this Court to be necessary to cure monetary defaults under the Debtor Agreements to be assumed and assigned in connection with the Sale (the "Cure Amounts"), the Debtor will request that this Court authorize at the Sale Hearing the assumption and assignment to the Lender Purchaser of the Debtor Agreements, and the rejection of the Other Contracts.

**III.    AUTHORITY FOR REQUESTED RELIEF**

**A.    SALES OUTSIDE THE ORDINARY COURSE OF BUSINESS**

32. Section 363 of the Bankruptcy Code provides that the Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

See 11 U.S.C. § 363(b). The Debtor's power to sell includes the power to cause such affiliates as hold title to, or are parties to, any of the Offered Assets to transfer or assign such Offered Assets to the Lender Purchaser.

33. To approve the use, sale or lease of property outside the ordinary course of business, this Court need only determine that the Debtor's decision is supported by "some articulated business justification." *See, e.g., Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also Stephens Ind., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Abbott Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Walter,* 83 B.R. 14, 16 (9th Cir. BAP 1988); *In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830 (Bankr. C.D. Cal. 1991).

34. Once the Debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Resources. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions.").

35. Indeed, when applying the "business judgment" rule, courts show great deference to a debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Accordingly, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefor. *See Schipper*, 933 F.2d at 515; *In re Lionel Corp.*, 722 F.2d at 1071; *In re Walter,* 83 B.R. at 16.

36. Section 363(k) provides that, unless the Court orders otherwise for cause shown, the holder of a secured claim in property that is to be sold pursuant to § 363(b) is entitled to credit bid its claim in connection with any sale of such property. 11 U.S.C. § 363(k).

37. As explained above, the Debtor has a sound business justification for selling the Offered Assets to the Lender Purchaser at this time. After extensive marketing of the Offered Assets,

the Lender Bid was the best and highest offer. Moreover, given the Resort's looming budget shortfall and other time constraints, the Debtor has determined, in the exercise of its considered business judgment that the most viable option for maximizing the value of its estate is through the Auction. The Debtor's request for approval of the Sale as requested herein should be granted accordingly.

**B.    SALES FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

38.    Under § 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39.    Because section 363(f) is drafted in the disjunctive, the Debtor's satisfaction of any one of its five requirements will be sufficient to permit the sale of the Offered Assets free and clear of the Interests and Claims. Citigroup clearly consents to the Sale. The Debtor anticipates other parties claiming an Interest or Claim in the Offered Assets, including WVNB, GE, BHP, John Deere, Textron, DWC and FreshPoint will consent to the Sale, thus satisfying the requirements of § 363(f)(2).

40.    In the event that any Other Debtor Secured Creditor refuses to consent to the Sale, the Debtor intends to request that this Court approve the Sale of the Other Assets in which such creditor claims an Interest free of such Interest pursuant to § 363(f)(4) and/or (5). The Debtor can satisfy the requirements of § 363(f)(5) because the Other Debtor Secured Creditors can be compelled to accept a money satisfaction of their interests in legal or equitable proceedings. Such legal or equitable proceedings include proceedings pursuant to A.R.S. § 47-9617, which provides that the disposition of

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

collateral by a secured party "discharges the security interest under which the disposition is made." *Id*. *See In re Jolan, Inc.*, 403 B.R. 866, 869 (Bankr. W.D. Wash 2009) (discussing *Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25 (9th Cir. BAP 2008) and holding that a creditor could be compelled to accept a money satisfaction of its interests under Washington Commercial Code provision 9A-617, which is identical to A.R.S. § 47-9617).

41.     In the event that the Interest of any non-consenting Other Debtor Secured Creditor cannot be removed as set forth above, the Debtor intends to request that this Court approve the Sale of the Offered Assets free of such Interest subject to appropriate funding of the Claims Escrow with respect to such creditor's alleged secured claim as adequate protection for such claim.

42.     The Debtor acknowledges that the Affiliate Offered Assets cannot be sold free of the liens of the Affiliate Secured Creditors, and such liens are, as set forth above, Permitted Encumbrances.

43.     Accordingly, the Debtor believes that it may sell the Offered Assets free and clear of all Interests other than the Permitted Encumbrances, and requests that this Court so Order.

**B.     ASSUMPTION AND ASSIGNMENT, OR REJECTION, OF THE DEBTOR AGREEMENTS AND THE OTHER CONTRACTS**

44.     As a debtor-in-possession, the Debtor has the right, subject to Court approval, to assume or reject any executory contracts or unexpired leases. *See* 11 U.S.C. § 365(a).     The assumption or rejection of an executory contract or unexpired lease by a debtor-in-possession is subject to review under the business judgment standard.     If such business judgment has been reasonably exercised, the Court should approve the assumption or rejection. *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *Sharon Steel Corp. v. National Fuel Gas Distribution*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re RLR Celestial Homes, Inc.*, 109 B.R. 36, 46 (Bankr. S.D.N.Y. 1989).

45.     Section 365(b)(1) of the Bankruptcy Code sets forth the requirements for assumption. This subsection provides as follows:

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

(b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

    (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

    (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

    (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

46.    The requirement of "adequate assurance of future performance" also applies when assumption is coupled with an intended assignment. Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the debtor only if --

    (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

    (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

47.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *See, e.g., EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.,* 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

48. Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

49. In the exercise of its business judgment, the Debtor intends to assume and assign the Debtor Agreements and to reject the Other Contracts. To the extent that any Cure Amounts are due with respect to any of the Debtor Agreements, provision will be made for payment of such amounts as herein set forth. Moreover, the Debtor will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Lender Purchaser, its experience in the industry, and its willingness and ability to perform under the Debtor Agreements to be assumed and assigned.

50. The Sale Hearing, in accordance with the Executory Contract Procedures will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Lender Purchaser to provide adequate assurance of future performance under the Debtor Agreements to be assumed and assigned. The Court therefore should have a sufficient basis to authorize the Debtor to assume and assign such agreements.

51. Accordingly, the Debtor requests authority to assume and assign the Debtor Agreements and to reject the Other Contracts.

**V.     NOTICE**

52. Notice of this Motion and the hearing thereon will be provided as set forth in any Order of this Court granting the Procedures Motion.

WHEREFORE, the Debtor respectfully requests that the Court enter the Sale Order in the form attached as **Exhibit 4**: (a) approving the Sale of the Offered Assets free and clear of all Interests except for the Permitted Encumbrances; (b) authorizing the assumption and assignment or rejection,

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

as applicable, of the Debtor Agreements and the Other Contracts; (c) entering the Injunction; and (d) granting such other and further relief as the Court may deem appropriate.

Dated: November 4, 2009        Respectfully submitted,

                                    MCNUTT LAW GROUP LLP


By:    */s/ Scott H. McNutt*
        Scott H. McNutt
        Michael A. Sweet
        Marianne M. Dickson
Attorneys for Kabuto Arizona Properties, LLC

Dated: November 4, 2009        Respectfully submitted,

                                    ENGELMAN BERGER, P.C.


By:    */s/ DWE, SBA #004193*
        David Wm. Engelman
        Scott B. Cohen
        Patrick A. Clisham
Attorneys for Kabuto Arizona Properties, LLC

ENGELMAN BERGER, P.C.
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012

EXHIBIT "1"

## Disclaimer:

**This list is based upon the best available current information. Nothing contained herein shall prejudice the Debtor, Citigroup, or JDM from later asserting (i) that an Agreement reflected as a Debtor Agreement is an Affiliate Agreement or in the alternative, that an Agreement reflected as an Affiliate Agreement is a Debtor Agreement, or (ii) that a document reflected as an executory contract herein is in fact a financing transaction, or that a document presently believed to evidence a financing transaction is an executory contract. Moreover, the appearance of an Agreement on this Exhibit in no way prejudices the right of the Lender Purchaser to decline to take an assignment thereof at Closing.**

## I. WATER RIGHTS AGREEMENTS, LEASES OR CERTIFICATES:

DEBTOR

1. Contract No. 113781, Kabuto Arizona Properties, L.L.C. Contract[1] for Sale and Use of Non-Potable Water for Turf Irrigation dated September 22, 2004, by and between the City of Phoenix, a municipal corporation, and Kabuto Arizona Properties, L.L.C., an Arizona limited liability company, which Contract was assigned to the Debtor on or about June 6, 2007.

2. Any and all agreements with or approvals or licenses of Salt River Project relating to the supply of water by or through Salt River Project for the Arizona Biltmore golf courses.

3. Water Facilities Easement, Operation and Maintenance Agreement dated April 4, 1990, by and between Suncor Development Company, an Arizona corporation, and Kabuto International Phoenix, Inc. a California corporation, which Agreement was assigned to the Debtor on or about June 6, 2002.

4. Any and all agreements with Liberty Water related to the supplying of treated wastewater effluent to the Wigwam Resort and golf courses.

5. Salt River Project License to Use Right-of-Way dated August 2, 2004, License #0400031, granted to Kabuto Arizona Properties, L.L.C., an Arizona limited liability company, relating to Water Transmission Pipe for Off Project Delivery.

---

[1] Any and all references in this Exhibit 1 to "contract" or "agreement" shall include any and all agreements, contracts, amendments, schedules, addendums, appendixes, modifications, addition, order forms, invoices, terms and conditions and/or sales cover sheets related thereto.

6.  Water Use Agreement dated August 29, 1977, by and between Arizona Biltmore Estates and Squaw Peak Land Company.

7.  Type 2 Lease dated April 4, 1990, by and between TypeTwo, Inc., a Delaware corporation, and Kabuto International Phoenix, Inc., a California corporation, which Lease was assigned to the Debtor on or about June 6, 2007.

## AFFILIATE/OTHER

1.  Water Rights Agreement dated June 30, 1988, by and between The Equitable Life Assurance Society of the United States, a New York corporation, and Arizona Biltmore Golf Courses, an Arizona general partnership.

2.  Certificate of Grandfathered Groundwater Right No. 58-105274, issued on August 19, 1988 by the Arizona Department of Water Resources to Equitable Life Association and Arizona Biltmore Golf Courses, pertaining to Type 2 Non-Irrigation Grandfathered Rights.

## II. OTHER LEASES OR AGREEMENTS:

### A. THE WIGWAM GOLF RESORT & SPA CONTRACTS AND AGREEMENTS.

DEBTOR

1. The Wholesale Processing Agreement, entered into as of September 4, 2009, by and between Specialty Textile Services and The Wigwam Golf Resort & Spa, relating to rooms linen processing.

2. The Service Agreement entered into on September 3, 2009, by and between HireRight, Inc. and Destination Arizona Management, Inc., dba Wigwam Resort.

3. The Equipment Lease made on or about June 2, 2008, by and between Kabuto Arizona Properties, LLC and Puget Sound Leasing Co., Inc.

4. The Agreement for Services made as of September 17, 2009, between LandCorp Property Maintenance I, Inc. and Wigwam Golf Resort & Spa.

5. The SESAC, Inc. Hotel, Motel & Resort Performance License Agreement, effective as of November 1, 2007, by and between SESAC, Inc. and Kabuto Arizona Properties dba Wigwam Golf Resort & Spa.

6. The Commercial Services Agreement dated June 20, 2007, between Cox Business Services and Wigwam Resort, and any and all agreements thereafter between the parties.

7. Database Management Services Agreement, dated February 8, 2008, between Littleton Marketing Group LLC, d/b/a LMG Data Mining, and The Wigwam Golf Resort & Spa.

8. The Iron Mountain Customer Agreement, between Iron Mountain Information Management, Inc. and Sheraton Operating Corp. as Agent for Kabuto Arizona, LLC, dba, The Wigwam, dated March 8, 2004, and any and all agreements thereafter between the parties, including that agreement dated April 1, 2009.

9. The Participant Services Agreement, undated, by and between Gemini Telemanagement Systems, Inc. and Wigwam Resort and Spa, and any and all agreements related thereto.

10. The Assured Maintenance Agreement beginning September 18, 2007, and the Planned Maintenance Agreement addition, beginning August 26, 2008, between McQuay Service and Wigwam Resort.

11. The Master Lease Agreement # 4374560, dated August 31, 2007, between General Electric Capital Corporation and Kabuto Arizona Properties, L.L.C., relating to all of the Reelmaster 5610 and the Groundsmaster 580-D equipment.

12. The Lease Agreement, dated August 29, 2007, between Prolink Capital and Kabuto Arizona Properties, LLC, the Prolink Solution Propledge Maintenance Agreement, dated August _, 2007 between U.S. Express Leasing, Inc. , as lessor, and the Debtor, as lessee, together with all related software as embedded therein (or otherwise) relating to the Prolink Prostar GPS System.

13. The Armored Car Service Agreement, made on June 26, 2002, by and between AT Systems West, Inc. and/or its successor in interest, Garada Armored Transport, and Wigwam Resort.

14. The Concession Agreement, entered into as of August 8, 2000, by and between The Wigwam Resort and The Hertz Corporation.

15. The Razzbonic Service Contract, effective November 1, 2005, between Razzbonic, LLC and The Wigwam Resort & Golf Club.

16. The Extended Warranty Agreement, dated August 14, 2006, among others, by and between Schindler Elevator Corporation and Spa at Wigwam Resort & Golf Club.

17. The LodgeNet Guest Pay Agreement and any extensions thereof and addendums thereto, dated September 19, 2001, by and between LodgeNet Entertainment Corporation and Kabuto Arizona Properties, LLC, and any LodgeNet Free-To-Guest Agreement related thereto.

18. The OpenTable Client Agreement, entered into on or about July 1, 2005, by and between OpenTable, Inc. and Kabuto Arizona d/b/a The Wigwam Resort & Golf Club, and any and all agreements thereafter between the parties, including those dated October 6, 2005 and December 19, 2006.

19. The Element Payment Services Merchant Agreement (Opticard), dated March 29, 2006, between Element Payment Services, Inc. and The Wigwam Resort & Golf Club.

20. The Master Service Agreement between NuCo2/US Airweld, Inc. and Wigwam Resort, effective as of June 1995.

21. The Agreement, effective April 1, 2000, by and between Wigwam Country Club and Kabuto Arizona Properties, L.L.C., an Arizona limited liability company.

22. The Lease Between Kabuto Arizona Properties, L.L.C., as Landlord and Elizabeth Arden Resort Spas, Inc., dated June 27, 2005, as amended by that certain First Amendment of Lease, dated as of June 27, 2005.

23. The System and Services Agreement, Agreement No. 663, dated September 26, 2005, between Galaxy Hotel Systems LLC and Kabuto Arizona Properties, LLC, and any and all software license, hardware purchase, software license support, and hardware support professional services agreements related thereto.

24. The Fire Protection Services Agreement, entered into on September 4, 2003, by and between Rural/Metro Corporation and Kabuto Arizona Properties, L.L.C.

25. The Lease dated September 12, 2005, between Jim McLean Enterprises, Inc. and Kabuto Arizona Properties, L.L.C., an Arizona limited liability company.

26. The Hotel Management Agreement effective as of May 29, 2009, by and between the Debtor and Destination Arizona Management, Inc.

AFFILIATE/OTHER

27. The ADP, Inc. National Account Services Master Services Agreement, effective as of February 24, 2006, by and between ADP, Inc. and Lowe Enterprises, Inc.

28. The License Agreement—Hotels and Motels, executed on July 25, 2000, between American Society of Composers, Authors and Publishers and Kabuto International Phoenix.

29. The Lease Agreement (No. 62441000), commencing December 1, 2005, by and between National City Golf Finance and Golf Solutions Arizona, L.L.C., and any amendments or supplements thereof and all Schedules executed in connection therewith.

30. Any and all booking or catering agreements that have or may be entered into by and between the Debtor or any Affiliate and any guest or other such customer relating to the use of any aspect of the Properties.

**B.     ARIZONA BILTMORE GOLF CLUB CONTRACTS AND AGREEMENTS**

DEBTOR

1. The Toro NSN SitePro Service Agreement and Warranty, dated October 18, 2007, between The Toro Company and Arizona Biltmore Country Club, including without limitation, all letter agreements related thereto,

the Service Agreement and Extended Warranty Agreement dated June 10, 2005 and the May 10, 2005 letter agreement.

2. The Monitoring Agreement, made November 4, 2008, between Centralized Vision and the Arizona Biltmore Country Club.

3. Agreement via invoices with High Peaks Water Services, Inc., relating to commercial water softener rental, and that certain Rental Agreement dated January 17, 1986, between Servisoft of Phoenix, Inc. and Adobe Club 19.

4. The MasterCare Pest Management Agreement, dated August 4, 2008, between MasterCare and Arizona Biltmore Country Club.

5. Agreement between Integrated Business Systems (Tectura) and Arizona Biltmore Country Club, as further evidenced by Invoice No. S ABCC 2009 and Sales Quote No. SQ-34737.

6. Membership interest in, and any other rights to which the Debtor may be entitled in connection with, the Arizona Biltmore Lakes Association.

7. Agreement between Hurricane Aquatics and The Arizona Biltmore Country Club, as further evidenced by Invoice No. 080109.

8. The Service Agreement, entered into as of January 30, 2008, by and between Specialty Textile Services and Adobe Restaurant relating to linen rentals.

## AFFILIATE

9. The Armored Car Service Agreement, made on September 1, 2005, by and between AT Systems West, Inc. and/or its successor in interest, Garada Armored Transport, and AZ Biltmore Golf Courses.

EXHIBIT "2"

**First American Title Insurance Company of New York**

**SCHEDULE B**
**(Affects Parcel A)**

**PART ONE:**

1. Taxes for the full year of 2009.
   (The first half is due October 1, 2009 and is delinquent November 1, 2009. The second half is due March 1, 2010 and is delinquent May 1, 2010.)

2. Reservations contained in the Patents from the United States of America, reading as follows:

   Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws and decisions of courts; and there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States of America.

   Said Patents recorded as follows:
   Recorded March 10, 1919 in Book 136 of Deeds, Page 22.
   Recorded June 16, 1916 in Book 120 of Deeds, Page 1.
   Recorded March, 1916 in Book 118 of Deeds, Page 215.
   Recorded March 6, 1916 in Book 118 of Deeds, Page 110.
   Recorded March 30, 1916 in Book 115 of Deeds, Page 552.
   Recorded April 23, 1915 in Book 115 of Deeds, Page 56.
   Recorded March 29, 1915 in Book 113 of Deeds, Page 212.

   and

   Reservations contained in Patents from the State of Arizona, reading as follows:

   This Patent is issued subject to any and all easements or rights of way heretofore legally obtained and now in full force and effect.

   Said Patents recorded as follows:

   Recorded December 16, 1929 in Book 242 of Deeds, Page 14.
   Recorded January 17, 1928 in Book 218 of Deeds, Page 28.

3. An easement for communication facilities and incidental purposes in the document recorded March 8, 1957 as Docket 2121, Page 545 of Official Records.

   (Affects Parcel No. 1)

4. An easement for underground electric lines and incidental purposes in the document recorded January 15, 1962 as Docket 3992, Page 58 of Official Records.

5.  Building lines, easements and restrictions, according to the plat of said Subdivision and instrument recorded January 29, 1963 in Book 101 of Maps, Page 21.

    (Affects Lot 221 of Parcel No. 1)

6.  An easement for water lines and incidental purposes in the document recorded April 18, 1962 as Docket 4109, Page 282 of Official Records.

7.  Declaration of Covenants, Conditions and Restrictions recorded January 29, 1963 in Docket 4444, Page 268, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

    (Affects Lot 221 of Parcel No. 1)

8.  Declaration of Covenants, Conditions and Restrictions recorded August 12, 1968 in Docket 7218, Page 719 and Supplement recorded May 12, 1969 in Docket 7604, Page 680, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

    (Affects Lot 221 of Parcel No. 1)

9.  An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded December 4, 1970 as Docket 8427, Page 655 of Official Records.

    (Affects Lot 221 of Parcel No. 1)

10. An easement for underground electric lines and incidental purposes in the document recorded October 11, 1965 as Docket 5757, Page 426 of Official Records.

    (Affects Parcel No. 2)

11. An easement for communication facilities and incidental purposes in the document recorded August 24, 1967 as Docket 6714, Page 503 of Official Records.

    (Affects Parcel No. 1)

12. An easement for sanitary sewer mains and incidental purposes in the document recorded May 13, 1967 as Docket 6835, Page 28 of Official Records.

    (Affects Parcel No. 2)

13. An easement for sanitary sewer mains and incidental purposes in the document recorded May 13, 1967 as Docket 6835, Page 30 of Official Records.

    (Affects Parcel No. 2)

2

14.     An easement for storm drain pipe and incidental purposes in the document recorded February 7, 1969 as Docket 7469, Page 510 of Official Records.

       (Affects Parcel No. 2)

15.     An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded August 27, 1976 as Docket 11829, Page 961 of Official Records.

       (Affects Parcel No. 2)

16.     An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded July 5, 1977 as Docket 12301, Page 532 of Official Records.

       (Affects Parcel No. 2)

17.     An easement for gas lines and appurtenant facilities and incidental purposes in the document recorded September 11, 1979 as Docket 13889, Page 354 of Official Records.

       (Affects Parcel No. 2)

18.     An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded October 14, 1980 as Docket 14757, Page 353 of Official Records.

       (Affects Parcel No. 2)

19.     An easement for communication facilities and incidental purposes in the document recorded June 11, 1981 as Docket 15302, Page 80 of Official Records.

       (Affects Parcel No. 1)

20.     An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded November 15, 1983 as 83-459643 of Official Records.

       (Affects Parcel No. 2)

21.     An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded October 7, 1987 as 87-620694 of Official Records.

       (Affects Parcel No. 1)

22.     An easement for communication facilities and incidental purposes in the document recorded April 4, 1990 as 90-148598 of Official Records.

       (Affects Parcel No. 1)

23.     An easement for underground electric and appurtenant facilities and incidental purposes in the document recorded April 4, 1990 as 90-148599 of Official Records.

(Affects Parcel No. 1)

24. An easement for gas pipeline and incidental purposes in the document recorded April 4, 1990 as 90-148600 of Official Records.

(Affects Parcel No. 1)

25. An easement for gas pipeline and incidental purposes in the document recorded April 4, 1990 as 90-148601 of Official Records.

(Affects Parcel No. 1)

26. An easement for gas pipeline and incidental purposes in the document recorded April 4, 1990 as 90-148602 of Official Records.

(Affects Parcel No. 1)

27. An easement for gas pipeline and incidental purposes in the document recorded April 4, 1990 as 90-148603 of Official Records.

(Affects Parcel No. 1)

28. An easement for gas pipeline and incidental purposes in the document recorded April 4, 1990 as 90-148604 of Official Records and thereafter partial release of said easement recorded July 21, 1993 as 93-0475229 of Official Records.

(Affects Parcel No. 1)

29. An easement for gas pipeline and incidental purposes in the document recorded February 28, 1991 as 91-083084 of Official Records.

(Affects Parcel No. 1)

30. An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded March 27, 1991 as 91-126902 of Official Records.

(Affects Parcel No. 1)

31. An easement for gas pipeline and incidental purposes in the document recorded April 11, 1991 as 91-153081 of Official Records.

(Affects Parcel No. 1)

32. An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded July 5, 1991 as 91-312381 of Official Records.

(Affects Parcel No. 1)

33. An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded February 14, 1992 as 92-076928 of Official Records.

   (Affects Parcel No. 1)

34. An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded March 30, 1992 as 92-162287 of Official Records and thereafter partial release of said easement recorded September 20, 1993 as 93-0633195 of Official Records.

   (Affects Parcel No. 1)

35. An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded November 18, 1992 as 92-655604 of Official Records.

   (Affects Parcel No. 2)

36. An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded November 18, 1992 as 92-655605 of Official Records.

   (Affects Parcel No. 1)

37. An easement for underground electric lines and appurtenant facilities and incidental purposes in the document recorded February 11, 1993 as 93-0082235 of Official Records.

   (Affects Parcel No. 1)

38. An easement for waterline and appurtenant facilities and incidental purposes in the document recorded September 20, 1993 as 93-0633196 of Official Records.

   (Affects Parcel No. 2)

39. An easement for sewer line and appurtenant facilities and incidental purposes in the document recorded September 20, 1993 as 93-0633197 of Official Records.

   (Affects Parcel Nos. 1 and 2)

40. An easement for electrical facilities and incidental purposes in the document recorded October 22, 1945 as Book 69 of Miscellaneous, Page 409 and Clarification of Easement recorded December 6, 1985 as 85-580147 of Official Records.

   (Affects Parcel No. 3)

41. An easement for electrical facilities and incidental purposes in the document recorded June 13, 1974 as Docket 10696, Page 769 of Official Records.

   (Affects Parcel No. 3)

42. An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded June 13, 1974 as Docket 10696, Page 770 of Official Records.

   (Affects Parcel No. 3)

43. An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded May 14, 1975 as Docket 11158, Page 1136 of Official Records.

   (Affects Parcel No. 3)

44. An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded October 30, 1975 as Docket 11397, Page 68 of Official Records.

   (Affects Parcel No. 3)

45. An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded June 26, 1978 as Docket 12989, Page 436 of Official Records.

   (Affects Parcel No. 3)

46. An easement for water discharge and drainage and incidental purposes in the document recorded February 26, 1986 as 86-091620 of Official Records and amended April 4, 1990 as 90-148606 of Official Records and amended August 10, 2001 as 2001-738024 of Official Records.

   (Affects Parcel No. 3)

47. An easement for water discharge and drainage and incidental purposes in the document recorded February 26, 1986 as 86-091621 of Official Records and amended April 4, 1990 as 90-148606 and amended August 10, 2001 as 2001-738024 of Official Records.

   (Affects Parcel No. 3)

48. An easement for communication facilities and incidental purposes in the document recorded August 3, 1987 as 87-490295 of Official Records.

   (Affects Parcel No. 3)

49. An easement for water and sewer lines and incidental purposes in the document recorded December 31, 1986 as 86-726589 of Official Records and as 86-726590 of Official Records.

   (Affects Parcel No. 3)

50. An easement for water lines and appurtenant facilities and incidental purposes in the document recorded September 20, 1993 as 93-0633198 of Official Records.

   (Affects Parcel No. 4)

51.   An easement for drainage pipes and appurtenant facilities and incidental purposes in the document recorded September 20, 1993 as 93-0633202 of Official Records.

(Affects Parcel No. 3)

52.   An easement for sewer line and appurtenant facilities and incidental purposes in the document recorded September 20, 1993 as 93-0633200 of Official Records.

(Affects Parcel No. 4)

53.   The terms and provisions including provisions regarding assessments, contained in the document entitled "Water Facilities Easement Operation and Maintenance Agreement" recorded April 4, 1990 as 90-148612 of Official Records and amended April 15, 1992 as 92-198179 and partial termination recorded August 10, 2001 as 2001-0738023 of Official Records and Third Amendment recorded August 6, 2004 as 04-916946 of Official Records and Assignment and Assumption of Water Facilities Easement Operation and Maintenance Agreement recorded June 12, 2007 as 2007-0679048 of Official Records.

54.   The terms and provisions contained in the document entitled "Covenants, Conditions and Restrictions" recorded as 96-852119 of Official Records; as 97-830601 of Official Records; as 96-852118 of Official Records; as 97-830600 of Official Records; as 98-1184142 of Official Records; as 99-1108885 of Official Records; as 99-1108886 of Official Records and as 98-1184143 of Official Records; as 2004-828314 of Official Records and as 2004-828315 of Official Records.

55.   The terms and provisions contained in the document entitled "Special Warranty Deed, Bill of Sale and Pipeline and Access Easement" recorded August 10, 2001 as 2001-0738019 of Official Records and re-recorded October 30, 2001 as 2001-1006088 of Official Records.

(Affects Parcel No. 5, 6 and 7)

56.   An easement for Emergency Vehicle Access and incidental purposes in the document recorded August 10, 2001 as 2001-0738020 of Official Records and re-recorded as 2005-0572955 of Official Records.

(Affects Parcel No. 3)

57.   The terms and provisions contained in the document entitled "Permanent Easement Agreement for Drainage Pipelines" recorded August 10, 2001 as 2001-0738025 of Official Records.

58.   An easement for drainage and incidental purposes in the document recorded December 30, 2003 as 2003-1743289 of Official Records.

(Affects Parcel No. 3)

59.     Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of The Village at Litchfield Park Phase I, as recorded in Plat Book 575 of Maps, Page(s) 33, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

        (Affects Parcel No. 5, 6 and 7)

60.     An easement for electric lines and appurtenant facilities and incidental purposes in the document recorded May 18, 2007 as 07-580585 of Official Records.

        (Affects Parcel No. 1)

61.     An unrecorded lease dated April 4, 1990, executed by Type Two Inc., a Delaware corporation as lessor and Kabuto International Phoenix Inc., a California corporation as lessee, as disclosed by a Memorandum of Lease recorded as 90-0148614 of Official Records.

        Thereafter the lessee's interest was assigned to Kabuto Arizona Properties, LLC, an Arizona limited liability company.

        The lessee's interest under the lease has been assigned to Kabuto Arizona Properties, LLC, a Delaware limited liability company by assignment recorded June 12, 2007 as 2007-0679047 of Official Records.

        Thereafter Memorandum of Collateral Assignment of Type Two Lease recorded June 12, 2007 as 2007-0679052 of Official Records.

        (Affects Parcel A)

62.     Water rights, claims or title to water, whether or not shown by the public records.

**End of Schedule B**

## SCHEDULE B

### (Affects Parcel B)

**PART ONE:**

1.  Taxes for the full year of 2009.

    (The first half is due October 1, 2009 and is delinquent November 1, 2009. The second half is due March 1, 2010 and is delinquent May 1, 2010.)

2.  Reservations contained in the Patents from the United States of America, reading as follows:

    Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws and decisions of courts; and there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States of America.

    Said Patents recorded as follows:
    Recorded June 30, 1920 in Book 149 of Deeds, Page 587.
    Recorded September 19, 1922 in Book 169 of Deeds, Page 328.
    Recorded January 24, 1923 in Book 172 of Deeds, Page 148.
    Recorded August 1, 1928 in Book 223 of Deeds, Page 528.
    Recorded December 11, 1934 in Book 287 of Deeds, Page 218.

3.  Reservations contained in the Patents from the United States of America, reading as follows:

    Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws and decisions of courts, and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom, should the same be found to penetrate or intersect the premises hereby granted, as provided by law, and there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States of America.

    Said Patents recorded as follows:
    Recorded in 1891 in Book 26 of Deeds, Page 457.
    Recorded August 5, 1908 in Book 79 of Deeds, Page 383.

4.  Reservations contained in the Patents from the United States of America, reading as follows:

    Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water

9

rights as may be recognized and acknowledged by the local customs, laws and decisions of courts; but excepting rights of way over, across and through said lands for canals and ditches, constructed or to be constructed, by its authority, all in the manner prescribed and directed by the Act of Congress approved August 30, 1890, (26 Stat., 391). To secure payment to the United States of America or its successors in the ownership or control of the works constituting and appertaining to the said reclamation project, all sums due, or to become due the United States of America or its successors in the control of said reclamation project in connection with said land and water rights, alien prior and superior to all other liens, claims or demands whatsoever upon the lands herein and hereby described and conveyed, upon all water rights thereto appurtenant, and upon the right to receive and use water from the reservoirs and canals of said reclamation project, is expressly reserved.

Said Patents recorded as follows:
Recorded June 25, 1920 in Book 150 of Deeds, Page 109.
Recorded January 13, 1927 in Book 207 of Deeds, Page 200.

5. Reservations contained in the Patent from the United States of America, reading as follows:

    Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws and decisions of courts, and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom, should the same be found to penetrate or intersect the premises hereby granted, as provided by law.

    Said Patent recorded April 22, 1898 in Book 26 of Deeds, Page 154.

6. The liabilities and obligations imposed upon said land by reason of: (a) inclusion thereof within the boundaries of the Salt River Project Agricultural Improvement and Power District; (b) membership of the owner thereof in the Salt River Valley Water Users' Association, an Arizona corporation and (c) the terms of any Water Right Application made under the reclamation laws of the United States for the purpose of obtaining water rights for said land. (All assessments due and payable are paid.)

7. Any charge upon said land by reason of its inclusion in Arizona Biltmore Estates Village Association, Inc. (All assessments due and payable are paid.)

8. An easement for sewer system and incidental purposes in the document recorded February 13, 1936 as Book 296 of Deeds, Page 528 of Official Records.

9. An easement for gas mains and incidental purposes in the document recorded July 1949 as Docket 479, Page 95 of Official Records.

10. Building lines, easements and restrictions, according to the plat of said Subdivision and instrument recorded January 1932 in Book 22 of Maps, Page 29 .

11. An easement for water pumping station and incidental purposes in the document recorded May 19, 1954 as Docket 1354, Page 132 of Official Records.

12. An easement for gas mains and incidental purposes in the document recorded October 10, 1954 as Docket 1466, Page 407 of Official Records.

13. License Agreement recorded February 7, 1955 as Docket 1538, Page 271.

14. An easement for underground power and ingress and egress and incidental purposes in the document recorded January 25, 1968 as Docket 6939, Page 612 of Official Records.

    (Affects Parcel No. 8)

15. An easement for overhead and underground power and incidental purposes in the document recorded January 25, 1968 as Docket 6939, Page 615 of Official Records.

    (Affects Parcel No. 8)

16. An easement for underground power and incidental purposes in the document recorded April 23, 1968 as Docket 7063, Page 813 of Official Records.

    (Affects Parcel Nos. 2 and 8)

17. An easement for sewer mains and agreement and incidental purposes in the document recorded March 24, 1970 as Docket 8055, Page 657 and re-recorded April 9, 1970 as Docket 8081, Page 212 of Official Records.

    (Affects Parcel No. 1)

18. All matters as set forth in Dedication, recorded November 14, 1974 as Docket 10911, Page 64.

    (Affects Parcel Nos. 2, 12, 12A and 13)

19. All matters as set forth in Squaw Peak Vista, recorded September 17, 1976 as Book 185 of Maps, Page 33.

20. Declaration of Covenants, Conditions and Restrictions recorded in Docket 11531, Page 1080; Amendment recorded as Docket 13989, Page 995; Assignment recorded as Docket 14799, Page 7; Assignment recorded as Docket 15541, Page 1071; amended recorded as Docket 15718, Page 493; Notice of Effect of Master Dedication recorded as 83-114039 of Official Records; Notice of Disapproval of Second Amendment recorded as 85-006058, of Official Records and Supplement recorded as 96-0496203 of Official Records and thereafter Miscellaneous Notice Access Protocols recorded February 28, 2003 as 2003-242002 of Official Records, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

21.  An easement for water mains and incidental purposes in the document recorded October 7, 1976 as Docket 11891, Page 832 of Official Records.

(Affects Parcel Nos. 2 and 8)

22.  An easement for access and incidental purposes in the document recorded November 16, 1976 as Docket 11946, Page 560 of Official Records.

(Affects Parcel No. 1)

23.  All matters as set forth in Map of Dedication, recorded November 29, 1976 as Book 186 of Maps, Page 34.

(Affects Parcel No. 1)

24.  An easement for sanitary sewer and incidental purposes in the document recorded February 22, 1977 as Docket 12086, Page 656 of Official Records.

Thereafter partially abandoned December 31, 1996 as 96-0909570 of Official Records.

(Affects Parcel Nos. 2, 9, 14 and 16)

25.  An easement for water line and incidental purposes in the document recorded February 22, 1977 as Docket 12086, Page 658 of Official Records.

(Affects Parcel No. 2, 3 and 4)

26.  All matters as set forth in Map of Dedication, recorded October 6, 1977 as Book 193 of Maps, Page 36.

(Affects Parcel Nos. 2 and 4)

27.  Declaration of Covenants, Conditions and Restrictions recorded in Docket 12246, Page 1155; amended April 17, 1979 as Docket 13574, Page 28 and Assignment of Benefits and Rights recorded August 29, 1979 as Docket 13863, Page 619 , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

(Affects Parcel Nos. 2 and 9)

28.  An easement for underground power and incidental purposes in the document recorded June 22, 1977 as Docket 12280, Page 1179 and re-recorded July 13, 1977 as Docket 12314, Page 1118 of Official Records.

(Affects Parcel No. 2)

29.  All matters as set forth in Grant of Easement and Declaration of Covenants, recorded November 2, 1977 as Docket 12522, Page 2.

12

(Affects Parcel Nos. 2, 3, 4 and 5)

30. An easement for underground power and incidental purposes in the document recorded January 5, 1978 as Docket 12638, Page 1340 of Official Records.

(Affects Parcel Nos. 2 and 8)

31. An easement for water line and incidental purposes in the document recorded March 6, 1978 as Docket 12752, Page 933 of Official Records.

(Affects Parcel Nos. 2, 3 and 4)

32. An easement for access and utilities and incidental purposes in the document recorded April 25, 1978 as Docket 12861, Page 619 of Official Records.

(Affects Parcel No. 1)

33. An easement for permanent access and incidental purposes in the document recorded June 30, 1978 as Docket 13000, Page 1495 of Official Records.

(Affects Parcel No. 1)

34. An easement for water line and incidental purposes in the document recorded July 7, 1978 as Docket 13012, Page 720 of Official Records.

(Affects Parcel Nos. 2 and 8)

35. An easement for access and utilities and incidental purposes in the document recorded June 30, 1978 as Docket 13002, Page 820 of Official Records.

(Affects Parcel No. 1)

36. An easement for ingress and egress and incidental purposes in the document recorded August 4, 1978 as Docket 13070, Page 1574 of Official Records.

(Affects Parcel No. 1)

37. An easement for access and incidental purposes in the document recorded September 7, 1978 as Docket 13139, Page 945 of Official Records.

(Affects Parcel No. 1)

38. An easement for underground power and incidental purposes in the document recorded October 11, 1978 as Docket 13208, Page 36 of Official Records.

(Affects Parcel No. 9)

39. An easement for access and public utilities and incidental purposes in the document recorded December 1, 1978 as Docket 13307, Page 1258 of Official Records.

(Affects Parcel No. 1)

40. An easement for sewer line and incidental purposes in the document recorded February 20, 1979 as Docket 13451, Page 1140 of Official Records.

(Affects Parcel No. 1)

41. An easement for water line and incidental purposes in the document recorded February 20, 1979 as Docket 13451, Page 1149 of Official Records.

(Affects Parcel No. 1)

42. An easement for water line and incidental purposes in the document recorded March 12, 1979 as Docket 13494, Page 610 of Official Records.

(Affects Parcel No. 1)

43. An easement for sewer purposes and incidental purposes in the document recorded April 18, 1979 as Docket 13576, Page 728 of Official Records.

(Affects Parcel No. 1)

44. An easement for communication and other facilities and incidental purposes in the document recorded March 15, 1979 as Docket 13633, Page 265 of Official Records.

(Affects Parcel No. 1)

45. An easement for communication and other facilities and incidental purposes in the document recorded March 15, 1979 as Docket 13633, Page 267 of Official Records.

(Affects Parcel No. 1)

46. Declaration of Covenants, Conditions and Restrictions recorded in Docket 13863, Page 611 and recorded October 31, 1980 as Docket 14799, Page 1, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

(Affects Parcel Nos. 2, 8 and 9)

47. An easement for conveying, transporting and delivering water and incidental purposes in the document recorded August 29, 1979 as Docket 13863, Page 630 of Official Records.

(Affects Parcel Nos. 3, 4, 5, 6 and 7)

48. All matters as set forth in plat of Arizona Biltmore Estates, recorded April 21, 1976 as Book 183 of Maps, Page 35.

49. An easement for sewer purposes and incidental purposes in the document recorded January 16, 1980 as Docket 14162, Page 571 of Official Records.

   (Affects Parcel No. 1)

50. All matters as set forth in plat of Arizona Biltmore Estates, Unit II, recorded August 4, 1977 as Book 191 of Maps, Page 38.

51. All matters as set forth in plat of Arizona Biltmore Estates Unit II Amended, recorded February 6, 1979    as Book 208 of Maps, Page 14.

52. All matters as set forth in Map of Dedication, recorded February 6, 1979 as Book 208 of Maps, Page 15 and Certificate of Correction recorded March 3, 1980 as Docket 14260, Page 292.

53. All matters as set forth in Replacement Golf and Maintenance Privilege Agreement, recorded May 29, 1980 as Docket 14448, Page 140; amended August 3, 1981 in Docket 15422, Page 1350; amended September 6, 1984 in 84-391051, of Official Records; Assignment recorded December 14, 1984 in 84-539901, of Official Records; December 14, 1984 in 84-539903, of Official Records and July 3, 1980 in 90-298981, of Official Records and Notice of Rights and Interests and Notice of Continuing Right of Refusal and Option to Purchase recorded July 11, 1994 in 94-0531061, of Official Records and Third Amendment recorded July 15, 1996 in 96-0496197 of Official Records.

54. An easement for roadway purposes and incidental purposes in the document recorded June 10, 1980 as Docket 14472, Page 227 of Official Records.

   (Affects Parcel No. 1)

55. An easement for underground power and incidental purposes in the document recorded January 7, 1981 as Docket 14941, Page 1193 of Official Records.

   (Affects Parcel Nos. 2, 8 and 9)

56. An easement for underground power and incidental purposes in the document recorded January 23, 1981 as Docket 14978, Page 458 of Official Records.

   (Affects Parcel No. 2, 8, 9 and 15)

57. All matters as set forth in Declaration of Easement, recorded September 25, 1981 as Docket 15541, Page 1072.

   (Affects Parcel No. 1)

58. An easement for water line and incidental purposes in the document recorded November 31, 1981 as Docket 15670, Page 564 and Page 566 of Official Records.

15

59. An easement for gas line and incidental purposes in the document recorded February 11, 1983 as 83-052393 of Official Records.

   (Affects Parcel No. 2, 8 and 9)

60. All matters as set forth in Agreement, recorded May 26, 1983 as 83-200630 of Official Records; Assignment recorded December 14, 1984 as 84-539906 of Official Records and Confirmation of Right of Way recorded December 14, 1984 as 84-539908 of Official Records.

61. An easement for underground power and incidental purposes in the document recorded March 2, 1984 as 84-087588 of Official Records.

   (Affects Parcel No. 1)

62. An easement for underground power and incidental purposes in the document recorded August 10, 1984 as 84-350592 of Official Records.

63. An easement for overhead and underground power and incidental purposes in the document recorded November 28, 1984 as 84-512224 of Official Records.

   (Affects Parcel Nos. 2, 8 and 9)

64. All matters as set forth in Revocable Easement, recorded March 4, 1988 as 88-101784 of Official Records.

65. All matters as set forth in plat of Arizona Biltmore Estates Amended, recorded February 6, 1990 as Book 337 of Maps, Page 13.

66. All matters as set forth in Agreement, recorded May 11, 1990 as 90-212491 of Official Records.

67. All matters as set forth in Easement and Agreement for Reservation of Improvements, recorded May 11, 1990 as 90-212495 of Official Records.

   Amendment recorded March 8, 2000 as 00-173561 of Official Records.

68. All matters as set forth in Water Use Agreement by and between Arizona Biltmore Estates, Inc., a Delaware corporation and Squaw Peak Land Company, a Delaware corporation, dated August 29, 1977, recorded August 29, 1977 as Docket 12402, Page 1165.

69. An easement for gas pipelines and appurtenances and incidental purposes in the document recorded January 31, 1995 as 95-0055611 of Official Records.

   (Affects Parcel Nos. 2 and 8)

16

70. All matters as set forth in Easement and Use Agreement to construct an entry wall and install and maintain landscaping, recorded April 18, 1996 as 96-0264679 of Official Records.

   (Affects Parcel No. 1)

71. An easement for roadway and incidental purposes in the document recorded July 13, 1960 as Docket 3346, Page 367 of Official Records.

   (Affects Parcel No. 1)

72. An easement for flood control facilities and incidental purposes in the document recorded March 7, 1977 as Docket 12106, Page 571; recorded August 10, 1977 as Docket 12386, Page 518 of Official Records.

   Thereafter Amended by Quit Claim Deed recorded November 26, 2002 as 2002-1259162 of Official Records and recorded December 29, 1978 as Docket 13355, Page 986.

   (Affects Parcel Nos. 1, 2, 8 and 9)

73. Building lines, easements and restrictions, according to the plat of said Subdivision and instrument recorded April 21, 1976 in Book 183 of Maps, Page 35 and recorded December 31, 1996 as Book 431 of Maps, Page 1.

74. An easement for telephone and telegraph lines and incidental purposes in the document recorded June 12, 1939 as Book 58 of Miscellaneous, Page 171 of Official Records.

   (Affects Parcel No. 19B of Parcel 2)

75. The effect of inclusion with the flood control district of said county as disclosed by instrument recorded May 8, 1990 as 90-205155 of Official Records.

   (Affects Parcel No. 4)

76. An easement for pedestrian access and incidental purposes in the document recorded July 15, 1996 as 96-0496194 of Official Records.

77. The terms and provisions contained in the document entitled "Golf Course Easement, Use and Maintenance Agreement" recorded July 15, 1996 as 96-0496195 of Official Records and as 96-0496196 of Official Records.

   (Affects Parcel No. 12A)

78. An easement for flow meter and incidental purposes in the document recorded December 8, 2004 as 2004-1444776 and order accepting an easement for flow meter recorded February 9, 2005 as 2005-165148 of Official Records.

   (Affects Parcel No. 2)

79. The terms and provisions contained in the document entitled "Declaration of Restrictions for Golf Course Use (Links Golf Course)" recorded March 31, 2004 as 2004-331929 of Official Records.

80. The terms and provisions contained in the document entitled "Declaration of Restrictions for Golf Course Use (Adobe Golf Course)" recorded March 31, 2004 as 2004-331930 of Official Records.

81. An easement for power distribution and incidental purposes in the document recorded March 9, 2004 as 2004-238206 of Official Records.

   (Affects Parcel No. 1)

82. The terms and provisions contained in the document entitled "Notice of Community Association" recorded August 12, 2004 as 2004-0937322 of Official Records and recorded February 24, 2005 as 2005-225197 of Official Records.

83. Declaration of Covenants, Conditions, Restrictions and Easements, recorded February 3, 2003 in 2003-0131453 of Official Records and re-recorded August 2, 2004 as 2004-0894545 of Official Records, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

84. Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of Arizona Biltmore Golf Estates, as recorded December 31, 1996 in Plat Book 431 of Maps, Page(s) 1, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

   (Affects Parcel No. 14)

85. Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of Arizona Biltmore Golf Estates Amended II, as recorded April 2, 2003 in Plat Book 629 of Maps, Page(s) 21, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

86. The terms and provisions contained in the document entitled "Easement and Maintenance Agreement" recorded September 11, 2000 as 2000-0698494 of Official Records.

   (Affects Parcel No. 8 and 12A)

87. An easement for underground power and incidental purposes in the document recorded June 17, 1997 as 97-0405897 of Official Records.

(Affects Parcel No. 14)

88. An easement for gas main and incidental purposes in the document recorded October 24, 1962 as Docket 4333, Page 163 of Official Records.

(Affects Parcel No. 14)

89. An easement for pedestrian access and incidental purposes in the document recorded July 15, 1996 as 96-0496194 of Official Records.

(Affects Parcel No. 13)

90. An easement for gas pipeline and incidental purposes in the document recorded October 28, 2005 as 2005-1631103 of Official Records.

(Affects Parcel No. 2)

91. An easement for gas pipeline and incidental purposes in the document recorded March 14, 2006 as 2006-343253 of Official Records.

(Affects Parcel No. 2)

92. An easement for power distribution and incidental purposes in the document recorded December 4, 2006 as 2006-1583211 of Official Records.

93. Any charge upon said land by reason of its inclusion in Arizona Biltmore Lakes Association. (All assessments due and payable are paid.)

94. Variance in bearings and distances regarding the exception to Parcel 9 as shown on Boundary Survey recorded May 8, 2007 in Book 920 of Maps, Page 41.

95. All matters as set forth in Golf Ball Easement and Release, recorded April 2, 2008 as 2008-292512 of Official Records.

(Affects Parcel No. 9)

96. Water rights, claims or title to water, whether or not shown by the public records.

**End of Schedule B**

EXHIBIT "3"

**Disclaimer:**

This list is based upon the best available current information. Nothing contained herein shall prejudice the Debtor, Citigroup, or JDM from later asserting (i) that an Offered Asset reflected as a Debtor Offered Asset is an Affiliate Offered Asset or in the alternative, that an Offered Asset reflected as an Affiliate Offered Asset is a Debtor Offered Asset, or (ii) that the Debtor or an Affiliate, as applicable, is the lessee of an Offered Asset listed hereon rather than the holder of title, or (iii) that an Offered Asset listed hereon as personal property is in fact an accession to real estate. Moreover, the appearance of an Offered Asset on this Exhibit in no way prejudices the right of the Lender Purchaser to decline to take title thereto at Closing.

# I.    WATER RIGHTS RELATED PROPERTY

<u>DEBTOR</u>

1.     All shares of stock of TypeTwo, Inc., a Delaware corporation, owned by the Debtor.

2.     All real and personal property related to that certain water well no. 55-611721 at the Wigwam, originally transferred to and registered in the name of Kabuto Arizona Properties, L.L.C., an Arizona limited liability company.

<u>AFFILIATE/OTHER</u>

3.     All real and personal property related to those certain water wells nos. 55-643681 and 55-643682 at the Biltmore Courses, which are registered to Arizona Biltmore Golf Courses.

# II.   OTHER PROPERTY

<u>DEBTOR</u>

1.     The Personal Property that is the subject of the Sale Motion includes, but is not limited to, the following:

        All machinery, furnishings, equipment, fixtures, inventory and articles of personal property and accessions thereof and renewals, replacements thereof and substitutions thereof, including, but not limited to, all furnaces, boilers, oil boilers, radiators and piping, coal stokers, refrigeration and sprinkler systems, wash-tubs, sinks, gas and electric fixtures, awnings, window shades, kitchen cabinets, plants and shrubbery and all other equipment and machinery, motor vehicles and other vehicles and all records, unexpired license plate and tag fees, radio base stations, global positioning equipment and other equipment related thereto, appliances; fittings and fixtures of every kind, all heating, air conditioning, plumbing and bathroom, lighting, communications, escalator and elevator fixtures, lobby furniture, furnishings

and equipment, beds, murphy beds, mattresses, bureaus, chiffoniers, chests, chairs, desk chairs, desks, lamps, mirrors, bookcases, tables, bedside tables, party tables, coffee tables, end tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, lamps, lampshades, mirrors, paintings, hangings, pictures and other artwork of any kind or nature, divans, drawings, luggage carts, luggage racks, stools, couches, sofas, ottomans, chinaware, linens, pillows, blankets, mattress pads, glassware, foodcarts, cookware, file cabinets, office equipment, typewriters, calculators, computers, printers, facsimile machines, copiers, reservation systems, surveillance and security systems, safe deposit boxes, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, clock radios, television sets, video game systems, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, fittings, plants, apparatus, stoves, ranges, ovens, microwaves, grills, steamers, fryers, preparation tables, slicers, grinders, ice cream machines and freezers, racks, bars, bar equipment, pots, pans, tableware, silverware, glassware, refrigerators, laundry machines, video equipment, lecterns, microphones, amplifiers, public address systems, lounges, umbrellas, pool equipment, golf carts and golf equipment, recreational and sports equipment, spa equipment, massage tables, manicure and pedicure stands, telephone equipment, tools, machinery, engines, wheels, parts, supplies, dynamos, motors, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical sings, bulbs, bells, fuel, conveyors, cabinets, lockers, shelving, spotlight equipment, dishwashers, garbage disposals, other customary equipment and other property of every kind and nature whatsoever, whether tangible or intangible, either (i) owned by the Debtor, or in which the Debtor has or shall have an interest, or (ii) owned by any affiliate of the Debtor (including GSA and KSK), or in which any affiliate of the Debtor has or shall have an interest, which is related to and/or used in connection with the operation of the Properties; *provided, however*, that the following property of GSA, KSK, and any other affiliate of the Debtor, is not part of the Sale Motion— any property that is not related to and/or used in connection with the operation of the Properties, including (a) all KSK property located at its place of business in San Francisco, California, (b) those certain residences located at 513 Litchfield, 400 Fairway and 402 Fairway, in Litchfield Park, Arizona, (c) the Blu Sushi Bar & Lounge, located at 118 N. Old Litchfield Road, Litchfield Park, Arizona, and (d) any property owned by GSA that is located in GSA's office at 105 W. Honeysuckle St., Litchfield Park, AZ (*provided, however*, that all books, records, computer records, documents and any other property that relate to the Properties shall remain the subject of the Sale Motion).

2. The irrigation pump station, telephone computer network system and all other equipment, software and other property more fully described in the Loan & Security Agreement No. 8326632001, last executed on May 30, 2007, by and between

General Electric Capital Corporation and Kabuto Arizona Properties, L.L.C., an Arizona corporation.

3.     All equipment that is the subject of the Master Lease No. 26038, dated June 1, 2006, by and between First American Commercial Bancorp, Inc., and Kabuto Arizona Properties, L.L.C. and all related documents thereto, including Equipment Schedule No. 1 (dishwasher/ice machines), Equipment Schedule No. 2 (sweeper/oven/freezer) and Equipment Schedule No. 3 (Big Joe Hydraulic Truck).

4.     All equipment, including two Sand Pro 3040 w/attachments and one Buffalo Turbine Blowers with attachments, that is the subject of that certain Master Lease Agreement No. 4374560 and related Lease Schedules, dated August 21, 2007, between General Electric Capital Corporation and the Debtor.

5.     The A: 2 Performance 100 HP 150psi Boilers; 7 Sony Dotworkz Extreme Hot Climate Robotic Systems; 5 Sony SNC-Z20N Fixed Network Cameras; 5 Videoalarm FDW8CF Fusion Domes; 5 Extreme Hot Climate Cooling Kits; 1 NetDVR-64/16 On-Net Surveillance Systems; 6 Optex VX-402 REC Motion Sensors; 6 Inovonics FA210 Universal Transmitters; 2 Inovonics FA416R Receivers and related hardware; 2 Proxim Tsunami MP11 Access Points; 8 Proxim Tsunami MP11 Client Points; 3 Moonblink 12 dB1 Omni Antennas; 3 LMR400 Coax Radio Cable; 1 Cable 5N Gel Coated Cat 5-1000f, all as further described in that certain UCC filing dated June 16, 2005 and any amendments or modifications thereof, and any other equipment related thereto, by and between Wells Fargo Equipment Finance, Inc. and Kabuto Arizona Properties, L.L.C., an Arizona limited liability company.

## AFFILIATE/OTHER

1.     All golf carts and all other equipment that is the subject of that certain Master Lease Agreement,[1] last executed on September 4, 2003, by and between Textron Financial Corporation and Golf Solutions Arizona, L.L.C, and any amendments or supplements thereof and all Schedules executed in connection therewith, including without limitation the following or otherwise related thereto:

    (a)     Schedule No. 01-00004 to the Master Lease Agreement, dated October 11, 2006;

    (b)     Schedule No. 1022565 to the Master Equipment Lease Agreement, dated August 30, 2007;

    (c)     Schedule No. 1027845 to the Master Equipment Lease Agreement, dated September 15, 2008; and

---

[1]     Any and all references in this Exhibit 3 to "contract" or "agreement" shall include any and all amendments, schedules, addendums, appendixes, modifications, addition, order forms, invoices and/or sales cover sheets related thereto.

(d) Schedule No. 1028214 to the Master Equipment Lease Agreement, dated October 8, 2008.

2. All equipment, including the Model # 4720 Tractor and Loader for 4720 Tractor that is the subject of that certain Lease Agreement, dated October 22, 2007, between Deere Credit Inc. and Golf Solutions Arizona, L.L.C. dba Wigwam Resort and Golf Club.

3. All equipment, including the Model #4520 Tractor and 400CX Loader that is the subject of that certain Customer Purchase Order For John Deere Products, dated May 1, 2006, between John Deere and Wigwam Resort and Golf Solutions Inc.

4. The McQuay Tubocor Chiller and Evapco Tower and other equipment related thereto, all as further described in that certain Promissory Note dated May 19, 2008, by and between West Valley National Bank and Kun S. Kim (Loan No. 52000696), or that certain Commercial Security Agreement dated May 19, 2008, and any amendments or modifications thereof.

5. Alcoholic Beverage License No. 06070419, issued by the State of Arizona Department of Liquor Licenses and Control, to Charles Richard Bates, as Agent of Golf Solutions Arizona, LLC.

6. Alcoholic Beverage License No. 06070124, issued by the State of Arizona Department of Liquor Licenses and Control, to Greg Edwin Miller, as Agent of Golf Solutions Arizona, LLC.

EXHIBIT "4"

SCOTT H. MCNUTT (CSBN 104696)
MICHAEL A. SWEET (CSBN 184345)
MARIANNE M. DICKSON (CSBN 249737)
**MCNUTT LAW GROUP LLP**
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487
Email: smcnutt@ml-sf.com
Email: msweet@ml-sf.com
Email: mdickson@ml-sf.com

Attorneys for Kabuto Arizona Properties, LLC

DAVID WM. ENGELMAN, SBA #004193
SCOTT B. COHEN, SBA #014377
PATRICK A. CLISHAM, SBA #023154
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE
SUITE 700
PHOENIX, ARIZONA 85012
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: dwe@engelmanberger.com
Email: sbc@engelmanberger.com
Email: bdp@engelmanberger.com

Attorneys for Kabuto Arizona Properties, LLC

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| In re: | Chapter 11 |
|---|---|
| KABUTO ARIZONA PROPERTIES, LLC, | Case No. 2:09-bk-11282-GBN |
| EIN 26-0231294 | **ORDER GRANTING DEBTOR'S MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND CERTAIN ASSETS OF THE DEBTOR'S AFFILIATES AS A GOING CONCERN AND TO ASSUME AND ASSIGN OR REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO** |
| Debtor. | |

Upon consideration of the Debtor's Motion For Authority to Sell Substantially All of the Debtor's Assets and Certain Assets of the Debtor's Affiliates as a Going Concern and to Assume And Assign or Reject Certain Executory Contracts and Unexpired Leases Related Thereto

(the "Sale Motion")[1] of Kabuto Arizona Properties, LLC (the "Debtor") seeking entry of an Order authorizing (i) the sale by the Selling Entities of the Offered Assets, free and clear of all Interests except Permitted Encumbrances; and (ii) the assumption and assignment of the Agreements, including the Debtor Agreements listed on **Exhibit A** attached hereto, and the rejection of the Other Contracts listed on **Exhibit B** attached hereto; the Selling Entities having agreed to sell the Offered Assets to the Lender Purchaser, subject to better and higher offers, on the terms and conditions provided in the Sale Motion; the Court having conducted the Auction of the Offered Assets in accordance with the Bidding Procedures; the Lender Purchaser having submitted the Winning Bid consisting of (i) $45,000,000, to be paid in the form of a credit bid under the Citi Loan for the Debtor Offered Assets, (ii) the cure of any monetary defaults under (a) the secured claims of the Affiliate Secured Creditors listed on **Exhibit C** attached hereto with an Interest in Affiliate Offered Assets to which the Lender Purchaser elects to take title, and (b) the Debtor Agreements listed on **Exhibit A** attached hereto and the Affiliate Agreements listed on **Exhibit D** attached hereto of which the Lender Purchaser elects to take an assignment, and (iii) the assumption of post-closing liabilities (the "Assumed Liabilities") arising with respect to the Agreements of which the Lender Purchaser elects to take an assignment; the Winning Bid having been determined by the Debtor and the Court to be the highest and best bid at the Auction for the Offered Assets; a final hearing on the Sale Motion having been held immediately following the Auction (the "Sale Hearing"); all interested parties having been given adequate notice of, and having been afforded an opportunity to be heard with respect to, the Sale Motion; the Court having reviewed and considered the Sale Motion, the objections thereto, if any, and the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; it appearing that the relief requested in the Sale Motion and authorization of the sale of the Offered Assets and the assumption and assignment of the Debtor Agreements and the rejection of the Other Contracts is in the best interests of the Debtor, its estate, creditors, and other parties in interest; and based on

---

[1] Capitalized terms not defined herein shall have meanings ascribed to them in the Sale Motion, a copy of which (absent exhibits) is attached hereto as **Attachment 1** for ease of reference.

the Sale Motion, the statements of counsel, the entire record of the Sale Hearing and the Auction and the record in this case, the Court having determined and concluded as follows and that good cause exists therefor:[2]

A.    On May 22, 2009, the Debtor filed its voluntary petition under chapter 11 of Title 11 of the U.S. Code, thereby commencing the above-captioned chapter 11 reorganization case;

B.    As a debtor-in-possession, the Debtor continues to manage the affairs of its estate and exercise all of the rights and powers of a trustee serving in a case under chapter 11 of the Bankruptcy Code in accordance with 11 U.S.C. § 1107.  Among those rights and powers are: (i) the right and power to sell property of the Debtor's estate out of the ordinary course of business, free and clear of Interests and Claims; and (ii) the right and power to assume and assign or reject unexpired leases and executory contracts, subject to approval by this Court after appropriate notice and an opportunity for a hearing; and (iii) the power to cause the Affiliates to transfer or assign the Affiliate Offered Assets and the Affiliate Agreements to the Lender Purchaser.  *See* 11 U.S.C. §§ 363(b), 363(f), 365(a), 365(f) and 1107;

C.    This Court has core subject matter jurisdiction to hear and resolve the Sale Motion pursuant to 28 U.S.C. §§ 1334(b), 1334(e), 157(b)(2)(A), 157(b)(2)(M), 157(b)(2)(N) and 157(b)(2)(O), and applicable local rules and General Orders regarding the referral to this Court of cases under title 11 of the United States Code;

D.    The Affiliates have consented to the Court's jurisdiction for the sole purpose of conveying the Affiliates' interest in the Offered Assets pursuant to the terms of the Sale Motion.

E.    The Offered Assets include the following, without limitation:

i.      All of the Selling Entities' interests in the Properties, including (without limitation) all of the Selling Entities' real property interests in the Resort, the Golf Facilities, and all buildings, facilities and other structures and improvements located on such real property, all rights and privileges

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

{02531.002/00122357.DOC /}
DMWEST #7337672

pertaining to such real property or to any of such structures and improvements, and all fixtures, installations, machinery, equipment and other property and appurtenances related thereto, and all appurtenances related to the Resort and the Golf Facilities as more particularly described in the Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing, dated as of June 12, 2007, and recorded as document number 2007-0679049 in the Official Records of Maricopa County, Arizona;

ii.   All of the Personal Property, including (without limitation) the items set forth on **Exhibit 3** to the Sale Motion;

iii.   All cash and all cash equivalents in whatever form, and deposit accounts, including, without limitation, utility deposit accounts, and cash or cash equivalent items set out in subparts viii, x, and xiii below, and including those held in the name of GSA (collectively, the "Debtor's Cash"), subject to the provisions of Paragraphs 5, 6, and 7 hereto;

iv.   All of the Selling Entities' intangible property that is related to and/or used in connection with the operation of the Offered Assets, including (without limitation), all registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Offered Assets), all domain names, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the patents), and all industrial designs, owned by the Selling Entities, and any registrations and applications therefor, and all databases, design databases, schematics and data collections and all rights therein owned by any Selling Entity;

v.   Any and all contracts, leases, and/or exchange agreements for the water supply (i.e., groundwater, Type 2 certificated rights, effluent, Central Arizona Project or Salt River Project water), and for the delivery of the water supply (i.e., infrastructure, canals, wells, pipelines, storage tanks or other existing delivery facilities), existing as of the date of this Order, including (without limitation) those contracts, leases and/or exchange agreements set forth on **Exhibit 1** to the Sale Motion;

vi.   All licenses, permits and other authorizations that are related to and/or used in the operation of the Offered Assets, including (without limitation) Alcoholic Beverage License Nos. 06070419 and 06070124 issued by the Arizona Department of Liquor Licenses and Control, all certificates of occupancy, and all pending applications for liquor licenses and other licenses, permits and authorizations;

vii.   The Agreements;

viii.   All accounts receivable and all notes and other receivables of every kind or character that are related to the operation of the Offered Assets, and any instruments evidencing the foregoing;

ix.   All telephone and facsimile numbers used in connection with the operation of the Offered Assets;

x.    All bank accounts and lockbox arrangements benefiting the Offered Assets;

xi.   All financial books, accounting records, files, lists, publications, and other records and data relating to the operation of the Offered Assets, including (without limitation) all guest and other customer lists of the Properties, regardless of the medium on which such information is stored or maintained;

xii.  All goodwill of the Selling Entities relating to the Offered Assets;

xiii. All credits, prepaid expenses, deferred charges, deposits and advance payments owned or held in connection with the operation of the Offered Assets, including (without limitation) guest room, meeting facility, customer, permittee or other deposits; and

xiv.  Any and all other assets necessary for the continued operation of the Offered Assets after the closing of the Sale (the "Closing") in the same manner as conducted by the Debtor and its affiliates (including, but not limited to, the Affiliates) prior to the Sale.

F.    As evidenced by the certificate of service and affidavit of publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Sale Motion, the Motion, the Bidding Procedures, the Auction, the Sale Hearing, the Sale, and the assumption and assignment to the Lender Purchaser, or the rejection, as applicable, of the Debtor Agreements and the Other Contracts (the "Designated Agreements") through the Contract Notice has been provided or otherwise excused in accordance with 11 U.S.C. §§ 102(1), 105(a), 363, and 365, Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007 and 9014, and Local Bankruptcy Rules 6004-1 and 6006-1; (ii) such notice was reasonable, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of any of the foregoing is or shall be required;

G.    A reasonable opportunity to object or be heard with respect to the Sale Motion and the assumption and assignment, or the rejection, as applicable, of the Designated Agreements has been afforded to all interested persons and entities required to be noticed (by mail or publication) by the Procedures Motion, including, without limitation (i) the Debtor's 20 largest unsecured creditors, (ii) all known persons or entities having or asserting Interests in the Offered

Assets, (iii) all parties to the Designated Agreements, (iv) all parties that have appeared in this case, (v) the Office of the United States Trustee, (vi) all persons or entities that have previously expressed, or that are otherwise known or believed by the Debtor to have, an interest in the Offered Assets, and their brokers, (vii) all managers and members of the Debtor, and (viii) the title company where escrow has been opened, and (viii) all persons or entities on the Debtor's mailing list;

H.     As demonstrated by (i) the Declaration of Kun Sam Kim attached to the Sale Motion as Exhibit 5, (ii) the evidence proffered or adduced at the Sale Hearing, and (iii) the representations of counsel made on the record at the Sale Hearing and in the Sale Motion, the Selling Entities have adequately marketed the Offered Assets, and conducted the Sale process in substantial compliance with the Procedures Order;

I.     Each Selling Entity (i) has full corporate power and authority to execute all documents as are necessary to complete the Sale, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Sale, and (iii) has taken all corporate action necessary to authorize and approve the Sale and the consummation by the Selling Entities of the transactions contemplated thereby;

J.     The Debtor has demonstrated sound business justifications (i) for the Sale pursuant to 11 U.S.C. § 363(b) prior to, and outside the context of, a plan of reorganization in that, among other things, the Resort's current and looming further budget shortfall and the time constraints for disposition of the Debtor Offered Assets because of the stay relief for the Citi Loan now in place make the proposed Sale the best available outcome for the Debtor, the Debtor's estate and its creditors, and (ii) to assume and assign to the Lender Purchaser, or reject, as applicable, the Designated Agreements in connection with the consummation of the Sale;

K.     The Sale was negotiated, proposed and entered into by the Debtor and the Lender Purchaser without collusion, in good faith, and from arm's-length bargaining positions. The Lender Purchaser is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is entitled to all of the protections afforded thereby;

L.     The Winning Bid (i) is fair and reasonable, (ii) is the highest and best offer

for the Offered Assets, (iii) is in the best interests of the Debtor, the Debtor's estate and its creditors, and (iv) constitutes reasonably equivalent value and fair consideration for the Offered Assets under the Bankruptcy Code and under the laws of the United States, the District of Columbia, and any state, territory, or possession, and the Sale does not and will not constitute a preferential transfer or fraudulent conveyance under the Bankruptcy Code or under the laws of any of the foregoing;

M.    The Debtor has provided adequate assurance, as required by 11 U.S.C. § 365(b)(1)(C), that the Lender Purchaser has the wherewithal, financial and otherwise, to perform in the future under the Debtor Agreements to be assumed and assigned at Closing.

N.    The Lender Purchaser would not have agreed to the Sale and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, and its creditors, if (i) the Sale were not free and clear of all Interests other than Permitted Encumbrances, (ii) the injunction set forth in Paragraph 11 hereof against the assertion of any Claims other than the Assumed Liabilities against the Lender Purchaser were not entered, or (iii) if the assumption and assignment, or rejection, as applicable, of the Designated Agreements were not approved under 11 U.S.C. § 365;

O.    All Other Debtor Secured Creditors have (i) consented to the Sale and to the release of their Interest in the Offered Assets, (ii) can be compelled to release their Interest in the Offered Assets under 11 U.S.C. § 363(f)(4) or (5), or (iii) are adequately protected in connection with the release of their Interest in the Offered Assets through the creation and funding of the Claims Escrow (as hereinafter defined); and

P.    Authorization of the Sale, the assumption and assignment, or rejection, as applicable, of the Designated Agreements, and consummation of the Sale at this time are in the best interests of the Debtor, its creditors, its estate and other parties in interest.

**NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.    The Sale Motion is granted as further described herein.

2.    All objections to the Sale Motion or the relief requested therein that have

not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.      Pursuant to 11 U.S.C. § 363(b), the Debtor is authorized to consummate the Sale pursuant to and in accordance with the terms and conditions provided in the Sale Motion and as further provided herein.[3]

4.      The Debtor and the other Selling Entities are authorized and directed to execute and deliver, and are empowered to perform under, consummate, and implement, all instruments and documents that may be reasonably necessary or desirable to implement the Sale, and to take all further actions as may be requested by the Lender Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Lender Purchaser or reducing to possession, the Offered Assets and the Agreements, or as may be necessary or appropriate to the performance of the transactions contemplated by this Sale Order. All persons and entities who are presently, or on the date of Closing may be, in possession of some or all of the Offered Assets are hereby directed to surrender possession of the Offered Assets to the Lender Purchaser on such date.

5.      (a) Subject to funding of the Claims Escrow, as defined and provided for in Paragraph 5(b) below, and pursuant to 11 U.S.C. §§ 105(a) and 363(f), the Offered Assets shall be transferred to the Lender Purchaser at the Closing free and clear of all Interests other than Permitted Encumbrances.

(b)     There shall be established with an escrow agent satisfactory to the Debtor, Citigroup, the Lender Purchaser, and the parties listed on **Exhibit E** attached hereto, or as ordered by this Court absent agreement, an escrow (the "Claims Escrow"), into which shall be deposited sums in the amounts, from the sources, and with respect to the Other Debtor Secured Creditors, reflected on **Exhibit E**. Any contribution obligation of Citigroup reflected on such Exhibit shall first be satisfied, to the extent thereof, out of the Debtor's Cash.

---

[3] To the extent the terms of the Sale Motion are inconsistent with the terms of this Sale Order, the terms of this Order shall control.

(c) No amount shall be disbursed from the Claims Escrow with respect to any Other Debtor Secured Creditor except upon (i) Order of this Court, or (ii) the consent of the contributors to the Claims Escrow on account of such creditor. Amounts left in the Claims Escrow with respect to any Other Debtor Secured Creditor after payment or other satisfaction of all amounts due or determined to be due to such creditor shall be returned to the contributors to the Claims Escrow on account of such creditor pro rata, based upon the amounts of their respective contributions.

6.     (a) Subject to and conditioned upon the Closing of the Sale and the payment at Closing of the cure amounts identified on **Exhibit A** hereto with respect to the Debtor Agreements (the "Cure Amounts"), (i) the Debtor's assumption and assignment to the Lender Purchaser of the Debtor Agreements, and the rejection of the Other Contracts is hereby approved pursuant to 11 U.S.C. §§ 105(a) and 365, and (ii) the Debtor is hereby authorized, in accordance with 11 U.S.C. §§ 105(a) and 365, to (x) assume and assign to the Lender Purchaser, effective upon the Closing of the Sale, the Debtor Agreements, (y) execute and deliver to the Lender Purchaser such documents or other instruments as may be necessary to assign and transfer such Debtor Agreements to the Lender Purchaser, and (z) reject the Other Contracts. The Cure Amounts shall be paid first, to the extent thereof, out of the Debtor's Cash (after taking account of any of such cash used to fund the Claims Escrow), and then by Citigroup.

(b) Conditioned upon payment of the Cure Amounts, all non-Debtor parties to the Debtor Agreements shall be barred, estopped and permanently enjoined from asserting any claim against the Lender Purchaser for any liquidated monetary defaults, claims or other obligations of the Debtor arising or accruing on or before the Closing under such agreements.

(c) Except as otherwise provided in this Sale Order or any other applicable Order of this Court, all rights and remedies of any non-Debtor party or the Lender Purchaser under any of the Debtor Agreements assumed and assigned at the Closing (together, the "Rights and Remedies") are fully preserved and shall be fully enforceable after the Closing against the Lender Purchaser or the non-Debtor party, as applicable, unless such Rights and Remedies are or were expressly waived or modified in a separate agreement or on the record at the Sale Hearing.

7.     To the extent that there are monetary arrearages owed to (i) the Affiliate Secured Creditors listed on **Exhibit C** with an Interest in Affiliate Offered Assets to which the Lender Purchaser elects to take title, or (ii) the third parties to the Affiliate Agreements listed on **Exhibit D** of which the Lender Purchaser elects to take an assignment, such arrearages shall be paid first, to the extent thereof, out of the Debtor's Cash (after taking account of any of such cash used to fund the Claims Escrow or pay the Cure Amounts), and then by Citigroup.

8.     Notwithstanding anything to the contrary in the Sale Motion or this Order, at Closing the following shall be distributed to Citigroup:  (a) the balance of the Debtor's Cash (after the uses set forth in paragraphs 5(b), 6(a) and 7 above); (b) all accounts receivable and all notes and other receivables of every kind or character that are related to the operation of the Offered Assets; (c) all bank accounts and lockbox arrangements benefiting the Offered Assets and any instruments evidencing the foregoing; (d) all credits, prepaid expenses, deferred charges; (e) all deposits and advance payments owned or held in connection with the operation of the Offered Assets; and (f) all utility and other deposit accounts, and all reserves held by or for the benefit of Citigroup in connection with the Citi Loan.

9.     Upon Closing, Citigroup shall be deemed to have waived its security interests and claims as to fifty percent (50%) of all proceeds, net of attorneys' fees and costs, obtained by the Debtor from the Starwood Claims, and to have conveyed those proceeds to the estate.  Citigroup shall retain its security interests and claims as to the remaining 50% of all proceeds, net of attorneys' fees and costs, obtained by the Debtor from the Starwood Claims.

10.     (a) This Sale Order (i) shall be effective as a determination that, as of the Closing, all Interests (other than Permitted Encumbrances) have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record

or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Offered Assets.

(b) On or before the Closing, each of the Debtor's creditors or other holders of an Interest (other than a Permitted Encumbrance) is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Offered Assets as such Interests may have been recorded or may otherwise exist.

(c) If any person or entity (other than the holder of a Permitted Encumbrance) that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests (other than a Permitted Encumbrance) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Offered Assets, then (i) the Debtor and the Lender Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Offered Assets, and (ii) the Lender Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in or against the Offered Assets of any kind or nature whatsoever, except Permitted Encumbrances.

(d) Each recorder of deeds or similar official for any city, county or governmental unit in which deeds or other instruments of transfer for any of the Offered Assets are to be recorded is hereby ordered and directed to accept the deeds or other instruments of transfer specified in this Section 10 for recording, and promptly to record such deeds or other instruments of transfer.

11. (a) Except as expressly permitted or otherwise specifically provided for in this Sale Order, all persons and entities other than the holders of Permitted Encumbrances or Assumed Liabilities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors holding Interests or Claims of any kind or nature whatsoever against or in the Debtor, the Debtor's estate,

or the Debtor Offered Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Offered Assets or the operation of the Offered Assets prior to the Closing, or the transfer of the Offered Assets to the Lender Purchaser are hereby forever barred, estopped, and permanently enjoined from asserting against the Lender Purchaser, its successors or assigns, its property, or the Offered Assets, such persons' or entities' Interests or Claims.

(b)  Except as provided in the Sale Motion, this Sale Order, or other Order of this Court, after the Closing, the Debtor and its estate shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such claims are forever barred and estopped from asserting such claims against the Debtor, its estate, and its successors or assigns.

(c)  The Lender Purchaser is not, and shall not be deemed to be, assuming any post-closing obligations owed to any Affiliate Secured Creditor, whether or not title to any Offered Asset will be transferred under and subject to the secured claim of such Affiliate Secured Creditor, and nothing contained in this Order or otherwise shall constitute or give rise to such an assumption.

12.  This Court retains jurisdiction to enforce and implement the terms and provisions of the Sale Motion and this Sale Order, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Offered Assets to the Lender Purchaser, (ii) compel delivery of the purchase price or performance of other obligations owed to the Debtor, (iii) resolve any disputes arising under or related to the Sale, except as otherwise provided therein, and (iv) interpret, implement, and enforce the provisions of this Sale Order.

13.  The transactions contemplated by the Sale are undertaken by the Lender Purchaser in good faith, as that term is used in 11 U.S.C. § 363(m), and the Lender Purchaser acted in good faith and is a good faith purchaser within the meaning of 11 U.S.C. § 363(m), and,

accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Lender Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing. The Lender Purchaser is a purchaser in good faith of the Offered Assets, and the Lender Purchaser is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

14.     The terms and provisions of the Sale Motion and this Sale Order (i) shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, and its creditors, Citigroup, the Lender Purchaser, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all Other Debtor Secured Parties, the Affiliates, all other persons asserting Interests or Claims in the Offered Assets or against the Debtor or its estate, and any subsequently appointed trustee(s) under any chapter of the Bankruptcy Code, and (ii) shall not be amended, modified, or otherwise affected in any way by the terms of any plan of reorganization or liquidation, or any Order of this Court confirming any such plan.

15.     The failure specifically to include any particular terms of the Sale, as provided in the Sale Motion, in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the terms of the Sale as provided in the Sale Motion be authorized and approved in their entirety.

16.     The terms of the Sale and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by the Debtor and the Lender Purchaser, and in accordance with the terms thereof, without further Order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate. Without limiting the generality of the foregoing, the Lender Purchaser, at the Closing, may decline in its sole discretion to take title to any Offered Asset, or an assignment of any Agreement, so long as no deduction is taken from the credit bid portion of the Winning Bid as a result thereof.

17.     Notwithstanding anything to the contrary in the Sale Motion or in this Sale Order, the Lender Purchaser shall not be obligated to close the Sale in the event that (i) the Selling

Entities are unable for any reason at Closing to deliver possession of, title to, or a valid assignment or transfer of any of the Offered Assets, free and clear of all Interests other than Permitted Encumbrances, or (ii) the Affiliates are unable to obtain any consents and approvals necessary for the assignment to the Lender Purchaser of any Affiliate Agreement.

18.     Except as provided in the Sale Motion, this Sale Order, or other Order of this Court, after the Closing, the Debtor and its estate shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such claims are forever barred and estopped from asserting such claims against the Debtor, its estate, its successors or assigns, its property or the Offered Assets.

19.     The Court finds that there is good cause to waive the 10-day stay under Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, because continuing losses at the Resort are diminishing the value of the Offered Assets. Accordingly, this Sale Order shall not be stayed for 10 days after the entry of the Sale Order and shall be effective and enforceable immediately upon entry.

**DATED AND SIGNED ABOVE.**

EXHIBIT "5"

SCOTT H. MCNUTT (CSBN 104696)
MICHAEL A. SWEET (CSBN 184345)
MARIANNE M. DICKSON (CSBN 249737)
**MCNUTT LAW GROUP LLP**
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487
Email: smcnutt@ml-sf.com
Email: msweet@ml-sf.com
Email: mdickson@ml-sf.com

Attorneys for Kabuto Arizona Properties, LLC

DAVID WM. ENGELMAN, SBA #004193
SCOTT B. COHEN, SBA #014377
PATRICK A. CLISHAM, SBA #023154
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE
SUITE 700
PHOENIX, ARIZONA 85012
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: dwe@engelmanberger.com
Email: sbc@engelmanberger.com
Email: bdp@engelmanberger.com

Attorneys for Kabuto Arizona Properties, LLC

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| KABUTO ARIZONA PROPERTIES, LLC, | Case No. 2:09-bk-11282-GBN |
| EIN 26-0231294 | **DECLARATION OF KUN SAM KIM** |
| Debtor. | |

I, Kun Sam Kim, hereby declare under penalty of perjury that the following statements are true.

## I.    INTRODUCTION AND ORGANIZATIONAL STRUCTURE OF DEBTOR AND ITS AFFILIATES.

1.    Kabuto Arizona Properties, LLC ("Debtor") is the debtor and debtor-in-possession in the above-captioned bankruptcy case.

2.    Debtor is a Delaware limited liability company with its principal place of business in

Maricopa County, Arizona.

3.      The Debtor's sole member is Kabuto Properties Company II, LLC ("KPC-II"). KPC-II is a Delaware limited liability company with its principal place of business in San Francisco, California. I am the sole member of KPC-II.

4.      I am also the sole shareholder and director of KSK Property Management, Inc. ("KSK"), a California corporation, which is the sole member of Golf Solutions Arizona, LLC, an Arizona limited liability company ("Golf Solutions").

5.      Golf Solutions manages and operates the five golf courses owned by the Debtor.

6.      Kabuto Arizona Properties, L.L.C. ("Kabuto Arizona") was formed as an *Arizona* limited liability company in March 1995 for the purpose of taking title to the Resort and the Biltmore Courses.[1] As a condition of refinancing the existing debt on the Resort and Biltmore Courses, Citigroup required that title to the properties be transferred to a fresh entity organized under the laws of Delaware, as opposed to one organized under Arizona law such as Kabuto Arizona. Accordingly, to facilitate the proposed financing, I formed KPC-II, which in turn formed the Debtor as a Delaware limited liability company. To allow the Debtor continued use of the "Kabuto Arizona Properties" name in the State of Arizona, the Arizona limited liability company changed its name to Kabuto Investments, L.L.C. (together with Kabuto Arizona, "Kabuto Investments").

7.      Kabuto Investments' sole member is Kabuto Properties Company, LLC ("KPC-I"). KPC-I is a Delaware limited liability company with its principal place of business in San Francisco, California. I am the sole member of KPC-I.

8.      Kabuto Investments conveyed the Properties (as hereafter defined) to the Debtor by Warranty Deed dated June 6, 2007. As evidenced by the Bill of Sale and Assignment dated June 6, 2007, and several Assignment and Assumption agreements dated June 6, 2007, Kabuto Investments also conveyed and assigned to Debtor: (i) all of the Personal Property related to the Properties; and (ii) all of its rights under the Agreements related to operation of the Properties as described below.

---

[1]    All capitalized terms used herein shall have the same meaning as in the Sale Motion (as hereafter defined) unless otherwise required by the context.

{02531.002/00123243.DOC /}

9. I have the authority to make this declaration on behalf of Debtor, KPC-II, Kabuto Investments, KPC-I, Golf Solutions, and KSK. All of the statements made herein are made on the basis of my own personal knowledge except for those statements made on the basis of belief, and as to such statements, I believe them to be true on the basis of the facts and information known to me.

10. I am making this Declaration in support of the following motions filed by the Debtor:

a. *Debtor's Expedited Motion For (1) Authority To Conduct Auction Of The Debtor's Assets And Certain Assets Of The Debtor's Affiliates As A Going Concern, (2) Approval Of Bidding Procedures And (3) Approval Of Procedures For Assuming And Assigning, Or Rejecting, Executory Contracts And Unexpired Leases Related Thereto,* (the "Auction Procedures Motion");

b. *Debtor's Expedited Motion For Entry Of Interim And Final Orders Approving Debtor-In-Possession Financing From Citigroup Global Markets Realty Corp.* (the "DIP Financing Motion"); and

c. *Debtor's Motion For Authority To Sell Substantially All Of The Debtor's Assets And Certain Assets Of The Debtor's Affiliates As A Going Concern And To Assume And Assign Or Reject Certain Executory Contracts And Unexpired Leases Related Thereto* (the "Sale Motion").

11. I have reviewed the Auction Procedures Motion, the DIP Financing Motion and the Sale Motion. All of the factual statements made therein are true and correct to the best of my knowledge and belief.

## II. THE DEBTOR'S BUSINESS OPERATIONS AND KNOWN INTERESTS IN THE OFFERED ASSETS

### i. Overview of the Offered Assets

12. The Debtor, along with KPC-II, Kabuto Investments, KPC-I, Golf Solutions, and KSK (collectively, the "Affiliates," and together with the Debtor, the "Selling Entities"), own and/or operate the Wigwam Golf Resort and Spa in Litchfield Park, Arizona, including three eighteen hole golf courses, including a non-contiguous real estate parcel known as "Sunset Point" (together, the "Resort"), and two eighteen-hole golf courses located at the Arizona Biltmore Country Club in Phoenix, Arizona (the "Biltmore Courses" and, together with the Resort, the "Properties"). In connection with such ownership and operation, the Debtor and/or an Affiliate are parties to certain executory contracts or unexpired leases important to such ownership and operation.

13. The Resort includes, among other things, 331 hotel guest rooms (including 72 luxury suites), 43,000 square feet of meeting and ballroom space, a Red Door Spa operated by Elizabeth Arden, nine illuminated tennis courts, three pools, three restaurants, a country club and three eighteen-hole golf courses (collectively, the "Wigwam Courses").

14. Sunset Point is a non-contiguous parcel of property located near the Resort consisting of approximately 2 acres of land with wooden storefronts and parking, worth approximately $50,000.

15. In addition to the Resort, the Debtor is also the owner of the Biltmore Courses located at the Arizona Biltmore Country Club on 2400 East Missouri Avenue, Phoenix, Arizona 85016. The Wigwam Courses and the Biltmore Courses are referred to collectively hereafter as the "Golf Facilities."

16. The Selling Entities also own personal property (the "Personal Property") that is related to and/or used in connection with the operation of the Properties, including: (i) hotel goods, machinery, vehicles, furniture, fixtures and equipment; (ii) golf course goods, machinery, vehicles, furniture, fixtures and equipment; (iii) general food and beverage and merchandise inventory for the hotel and golf courses; and (iv) intangible property; which Personal Property includes, but is not limited to, the items set out on **Exhibit 3** to the Sale Motion. The Personal Property that constitutes the Affiliate Offered Assets is so identified on such Exhibit 3.

### ii. Overview of the Agreements

17. As set forth above, certain Agreements are necessary to the successful operation of the Properties, including, without limitation, water rights agreements. The Debtor is a party to certain of such Agreements, and an Affiliate is party to certain other of such Agreements. **Exhibit 1** to the Sale Motion is a list of such Agreements that the Lender Purchaser desires to have the Debtor assume and assign to the Lender Purchaser in the event that the Lender Purchaser is the winning bidder. The list is subject to revision. Those Agreements that constitute Affiliate Agreements are so identified on **Exhibit 1**.

### iii. Citigroup's Loan and Security Interests

18. On June 12, 2007, the Debtor entered into a "Loan and Security Agreement" (the "Citi

Loan Agreement") with Citigroup pursuant to which Citigroup agreed to loan to Debtor the principal sum of $65,000,000.

19.     The Citi Loan Agreement is evidenced by the Note executed by the Debtor in favor of Citigroup (together, the "Citi Loan"). The Note is secured by, among other things, a first position deed of trust on the real properties owned by the Debtor, other than Sunset Point, and first position blanket security interests in all of the Debtor's and certain of the Affiliates' Personal Property as more fully set forth in the agreements and other documents evidencing Citigroup's security interest or lien on the Debtor's assets.

20.     As of the Petition Date, the principal balance of the Citi Loan was approximately $65,000,000, plus applicable interest, fees, late charges, reserves, and other charges. On September 8, 2009, Citigroup filed a Proof of Claim (Claim No. 145) in the amount of $73,269,029.77 as of the Petition Date ("Citigroup's Claim"). No objection to Citigroup's Claim has been filed.

## III.     THE PROPOSED SALE OF THE OFFERED ASSETS/ASSIGNMENT OF THE AGREEMENTS.

21.     Through the Sale Motion, the Debtor, together with the Affiliates, requests authority to sell the Offered Assets, free and clear of all Interests other than Permitted Encumbrances and, pursuant to the Injunction, all Claims other than the Assumed Liabilities. As referenced above, the Debtor has undertaken to market the Offered Assets for sale as a going concern. Specifically, for more than a year, the Debtor has been actively soliciting bids for a possible sale of some or all of the Offered Assets as a going concern. The Debtor's efforts in this regard have included the direct marketing of the Offered Assets and solicitation of purchase offers from resort investor groups and local business interests. For the past several months, the Debtor has engaged in increased efforts to sell the Offered Assets, including several lengthy negotiations with potential purchasers and investors that resulted in the negotiation of at least two letters of intent and asset purchase agreements.

22.     Notwithstanding such efforts, however, the Debtor has been unable to secure an executed purchase contract for the Offered Assets on terms that are more favorable than those set forth in the Sale Motion. Nonetheless, the Debtor intends, as set forth in the Auction Procedures

27. The Debtor has no present source of funding beyond its use of Citigroup's cash collateral. Debtor anticipates a significant budget shortfall at the close of the current operating month and further budget shortfalls in the very near term. In anticipation of the Sale, in which Citigroup and/or JDM will participate and be authorized to credit bid, Citigroup has proposed to make the DIP Loan to the Debtor upon the terms and conditions set forth in the DIP Financing Motion.

28. The DIP Loan will also fund a $150,000 carve-out to pay the expenses incurred and to be incurred by Debtor's counsel through the consummation of the sale of the Offered Assets. Such payment is necessary, and must be paid with funds advanced to the Debtor in the First Tranche of the DIP Loan, in order to ensure completion of the legal work necessary for the consummation of the sale.

29. Given the current market conditions, the posture of the Debtor's bankruptcy proceedings and the termination of the automatic stay under the Stay Relief Order, alternative financing is not available on terms more favorable to the Debtor or the Estate. Moreover, without the DIP Loan, the Debtor will not have the means to continue operating until the Sale can be approved. In the Debtor's sound business judgment, the DIP Loan will result in a benefit to the estate in that it will provide substantial funding for the Debtor's incurred and ongoing administrative expenses pursuant to the Budget while the Sale process takes place.

V. REPRESENTATION

30. I represent and warrant that neither the Debtor, the Affiliates, nor any other affiliate of the Debtor has removed any artwork or other Personal Property from the Properties outside of the ordinary course of business since April 24, 2009.

DATED this ___ day of November, 2009.

_____
Kun Sam Kim