SCOTT H. MCNUTT (CSBN 104696)
MICHAEL A. SWEET (CSBN 184345)
MARIANNE M. DICKSON (CSBN 249737)
**MCNUTT LAW GROUP LLP**
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487
Email: smcnutt@ml-sf.com
Email: msweet@ml-sf.com
Email: mdickson@ml-sf.com
Attorneys for Kabuto Arizona Properties, LLC

DAVID WM. ENGELMAN, SBA #004193
SCOTT B. COHEN, SBA #014377
PATRICK A. CLISHAM, SBA #023154
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE
SUITE 700
PHOENIX, ARIZONA 85012
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: dwe@engelmanberger.com
Email: sbc@engelmanberger.com
Email: pac@engelmanberger.com
Attorneys for Kabuto Arizona Properties, LLC

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>KABUTO ARIZONA PROPERTIES, LLC,<br><br>EIN 26-0231294<br><br>Debtor. | Chapter 11<br><br>Case No. 2:09-bk-11282-GBN<br><br>**DEBTOR'S EXPEDITED MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS APPROVING DEBTOR-IN-POSSESSION FINANCING FROM CITIGROUP GLOBAL MARKETS REALTY CORP.** |

Kabuto Arizona Properties, LLC, the debtor and debtor-in-possession in the above case (the "Debtor"), hereby moves pursuant to 11 U.S.C. §364(c) and (d), and Fed.R.Bankr.P. 4001(c), for the entry of an Order approving debtor-in-possession financing of up to $3,000,000 (the "DIP Loan") from Citigroup Global Markets Realty Corp. ("Citigroup"). The DIP Loan is necessary to fund expenses relating to the preservation, maintenance and operation of the Debtor's business pending the completion of the proposed sale of substantially all of the Debtor's assets (collectively, the "Offered Assets"), including without limitation the Wigwam Golf Resort & Spa, including a non-contiguous parcel of land known as "Sunset Point" (the "Wigwam Resort") and the two 18-hole golf courses

located at the Arizona Biltmore County Club (the "Biltmore Courses").

Continued operation of both the Wigwam Resort and the Biltmore Courses is necessary to preserve the value of the Offered Assets as a going-concern. Throughout this bankruptcy case, Debtor has been operating its business through the stipulated use of Citigroup's cash collateral. Absent funding of the DIP Loan, Debtor will be unable to pay the expenses of continuing to operate and will be forced to shut-down prior to completion of the proposed sale. Such a cessation of business, even for a short period of time, would result in immediate and irreparable harm to the going-concern value of the Offered Assets. Approval of the DIP Loan is therefore in the best interests of the estate.

In support of this motion, the Debtor states as follows:

## **SUMMARY OF THE PROPOSED LOAN**

### **Loan Terms And Conditions**

Citigroup, the Debtor's senior secured lender, proposes to make the DIP Loan to the Debtor's Estate upon the following terms and conditions:

- Citigroup shall advance up to $3,000,000 to the Debtor to cover: (a) current and anticipated budget shortfalls at the Debtor's resort and golf course properties; and (b) a $150,000 carve-out for the costs and fees of Debtor's bankruptcy counsel, as necessary to ensure the consummation of the sale of the Offered Assets. All advances shall be used strictly in accordance with a budget to be filed with the Court prior to the initial hearing on the instant Motion (the "Budget").

- All advances on the DIP Loan shall be deposited into a segregated account (the "Citi DIP Loan Account") established and managed by Debtor's property management firm, Destination Hotels & Resorts ("Destination").

- Advances on the DIP Loan shall be made in two tranches: (1) an interim advance of up to $660,000 (the "First Tranche"), to pay costs that are necessary to prevent immediate and irreparable harm to the estate pending a final hearing on the DIP Financing Motion; and (2) upon final approval of the DIP Loan, subsequent advance(s) up to the maximum principal balance of $3,000,000, to pay costs that are necessary to preserve the going-concern value of the Wigwam Resort and the Biltmore Courses pending consummation of the sale. Pursuant to Bankruptcy Rule 4001(c)(2), Debtor has separately filed a motion to set an expedited preliminary hearing on approval of funding the First Tranche.

- In exchange for the DIP Loan, Citigroup shall be: (i) allowed an administrative expense claim under 11 U.S.C. § 364(c)(1) with superiority over all other administrative expenses of the kind specified in 11 U.S.C. §§ 503(b) or 507(b); (ii) granted a lien against all unencumbered property of the Estate under 11 U.S.C. § 364(c)(2); (iii) granted a lien on all encumbered Estate property under 11 U.S.C. § 364(d)(1) that is senior in priority to

{02531.002/00123310.DOC /}

2

all other liens on the Estate's property, subject to the rights of JDM (hereinafter defined), as Citigroup's contract vendee for the Citi Note,[1] and (iv) granted a lien in Sunset Point (the "DIP Lien and Administrative Claim").[2]

- The DIP Loan will bear interest at the rate of 11.572% per annum, which is the rate currently in effect under the Citi Loan Agreement (as defined below), from the date that the DIP Loan is funded until it is paid in full.

- The DIP Loan will mature and be due and payable in full on the earlier of: (i) the date of the closing of the Sale (as defined below); or (ii) December 31, 2009.

- Citigroup shall have a first-position lien on all funds in the Citi DIP Loan Account as security for Debtor's obligation to repay the DIP Loan, as set forth in the proposed Order approving the DIP Loan. Citigroup's lien on the Citi DIP Loan Account shall be deemed perfected automatically and without the necessity for filing financing statements or taking any other actions that might otherwise be required for protection under the Uniform Commercial Code.

- Immediately following the consummation of the proposed sale of the Offered Assets, Citigroup shall have the authority to withdraw the remaining funds (if any) in the Citi DIP Loan Account and apply the same to the balance of the DIP Loan.

## **Proposed Use of Loan Funds.**

The funds from the DIP Loan will be used to meet operating, maintenance and preservation expenses relating the Debtor's resort and golf course properties strictly in accordance with the Budget. The initial $660,000 advance on the DIP Loan (the "First Tranche") will fund Debtor's payment of the following expenses, which must be paid within the next 15 days to prevent immediate and irreparable harm to the estate:

- a $150,000 carve-out for fees incurred and to be incurred by bankruptcy counsel to the Debtor, as necessary to ensure the consummation of the sale of the Offered Assets; and

- reimbursement to Citigroup of its payment of property taxes in the amount of $500,927.95, that are due on or before November 1, 2009.[3]

---

[1] Because Citigroup holds the first-position lien on all of Debtor's property (other than a non-contiguous parcel known as "Sunset Point"), and because Citigroup is undersecured, creditors holding junior liens on Debtor's assets were effectively unsecured as of the Filing Date and will not be prejudiced by the "priming" of their liens.

[2] Point is a non-contiguous parcel of property located near the Resort consisting of approximately 2 acres of land with wooden storefronts and parking, worth approximately $50,000. Kim Dec. at ¶14.

[3] Citigroup wired the funds for payment of the property taxes into the Citi DIP Loan Account on October 29, 2009. The taxes were paid on October 30, 2009 on behalf of the Debtor in order to avoid the assessment of substantial penalties for late payment. Citigroup is authorized to advance such funds on the Debtor's behalf under the terms of its deed of trust on the Debtor's property.

{02531.002/00123310.DOC /}

3

Upon the entry of an Order granting final approval of the DIP Loan, Debtor will be authorized to receive additional advances on the DIP Loan, up to the maximum principal balance of $3,000,000, with all such funds to be used strictly in accordance with the Budget. A copy of the Budget, which will include a detailed itemization of all expenses, will be filed with the Court prior to the initial hearing on the instant motion. However, the expenses will generally consist of the following:

- the previously approved deposit to Arizona Public Service of $150,000;
- the previously allowed receiver's and the receiver's counsel's fees of $454,936.73;
- a general liability insurance premium of $114,011;
- approximately $460,000 in working capital necessary to fund near-term operations of the Debtor's golf course operations; and
- approximately $1,105,000 in working capital necessary to fund near-term operations of the Resort.

**Grounds for Approval of the DIP Loan**

Given the current market conditions, alternative financing is not available on terms more favorable to the Debtor or the Estate. The Debtor has exercised its sound business judgment in seeking approval of the DIP Loan, and approval will result in a substantial benefit to the Estate by substantially funding payment of the Debtor's previously incurred and ongoing administrative expense claims. Accordingly, the Court should approve the DIP Loan on the terms and conditions stated herein.

This Motion is supported by the following Memorandum of Points and Authorities, the Declaration of Kun Sam Kim ("Kim Dec.") attached to the *Debtor's Motion For Authority To Sell Substantially All Of The Debtor's Assets And Certain Assets Of The Debtor's Affiliates As A Going Concern And To Assume And Assign Or Reject Certain Executory Contracts And Unexpired Leases Related Thereto* (the "Sale Motion"), and the papers and pleadings on file, all of which are incorporated herein by this reference.

/ / /

/ / /

/ / /

{02531.002/00123310.DOC /}

4

## MEMORANDUM OF POINTS AND AUTHORITIES

**I. FACTUAL AND PROCEDURAL BACKGROUND**

    **A. Parties and Jurisdiction**

    1. On May 22, 2009 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Debtor is continuing to operate its business as debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108. This Court has jurisdiction pursuant to 28 U.S.C. §§1334 and 157(a). This is a "core" proceeding pursuant to 28 U.S.C. §157(b)(2)(D).

    **B. Need for the DIP Loan**

    2. The Debtor and its non-debtor affiliates own and/or operate the Wigwam Golf Resort and Spa in Litchfield Park, Arizona, including three eighteen hole golf courses and a non-contiguous real estate parcel known as "Sunset Point" (together, the "Resort"), and two eighteen-hole golf courses located at the Arizona Biltmore Country Club in Phoenix, Arizona (the "Biltmore Courses" and, together with the Resort, the "Properties"). In connection with such ownership and operation, the Debtor and/or an Affiliate are parties to certain executory contracts or unexpired leases important to such ownership and operation. Kim Dec. at ¶12.

    3. On June 12, 2007, the Debtor entered into a "Loan and Security Agreement" (the "Citi Loan Agreement") with Citigroup pursuant to which Citigroup agreed to loan to Debtor the principal sum of $65,000,000. Kim Dec. at ¶18.

    4. The Citi Loan Agreement is evidenced by the Note executed by the Debtor in favor of Citigroup (together, the "Citi Loan"). The Note is secured by, among other things, first-position deeds of trust on the real properties owned by the Debtor, other than Sunset Point, and first-position blanket security interests in all of the Debtor's and certain of the Affiliates' Personal Property as more fully set forth in the agreements and other documents evidencing Citigroup's security interest or lien on the Debtor's assets. Kim Dec. at ¶19.

    5. As of the Petition Date, the principal balance of the Citi Loan was approximately $65,000,000, plus applicable interest, fees, late charges, reserves, and other charges. On September 8,

2009, Citigroup filed a Proof of Claim (Claim No. 145) in the amount of $73,269,029.77 as of the Petition Date ("Citigroup's Claim"). No objection to Citigroup's Claim has been filed. Kim Dec. at ¶20.

6. The Debtor filed this chapter 11 bankruptcy case intending to continue its businesses and restructure its secured and unsecured obligations through the chapter 11 reorganization process.

7. The Debtor has since pursued two alternative routes to reorganization including (1) seeking postpetition financing to support its ongoing operations and fund a plan of reorganization and (2) marketing the Properties for sale as a going concern in order to fund a plan of liquidation. During this time, however, economic conditions facing the Properties have worsened and the frozen credit markets have failed to thaw.

8. In light of the above, the Debtor and Citigroup stipulated to the entry of an Order (the "Stay Relief Order") whereby the automatic stay terminated without further Order because the Debtor failed to obtain a final Order authorizing the Debtor to sell the Properties by 5:00 p.m. MST on October 22, 2009.

9. Since that time, however, the Debtor and Citigroup have negotiated a sale of the Properties to be conducted pursuant to 11 U.S.C. § 363. Specifically, the Debtor has agreed to sell the Properties as a going concern to Citigroup or JDM Partners, LLC ("JDM"), Citigroup's contract vendee for the Citi Note, for a credit bid of $45,000,000, subject to higher and better bids submitted at an auction to be conducted by the Court. The terms of the sale to Citigroup or JDM (the "Sale") are set out in the Sale Motion, which is being filed contemporaneously with this Motion. Citigroup has agreed to fund the Debtor's operations through the continued consensual use of cash collateral and through the proposed DIP Loan strictly in accordance with the Budget, pending the Court's approval of the Sale Motion.

**C. The Proposed DIP Loan**

10. The Debtor has no present source of funding beyond its use of Citigroup's cash collateral. Debtor anticipates a significant budget shortfall at the close of the current operating month and further budget shortfalls in the very near term. In anticipation of the Sale, in which Citigroup

{02531.002/00123310.DOC /}

and/or JDM will participate and be authorized to credit bid, Citigroup has proposed to make the DIP Loan to the Debtor upon the terms and conditions set forth in the DIP Financing Motion. Kim Dec. at ¶27.

11. The DIP Loan will also fund a $150,000 carve-out to pay the expenses incurred and to be incurred by Debtor's counsel through the consummation of the sale of the Offered Assets. Such payment is necessary, and must be paid with funds advanced to the Debtor in the First Tranche of the DIP Loan, in order to ensure completion of the legal work necessary for the consummation of the sale. Kim Dec. at ¶28.

12. In exchange for making the DIP Loan, Citigroup shall be granted the DIP Lien and Administrative Claim.

13. Given the current market conditions, the posture of the Debtor's bankruptcy proceedings and the termination of the automatic stay under the Stay Relief Order, alternative financing is not available on terms more favorable to the Debtor or the Estate. Moreover, without the DIP Loan, the Debtor will not have the means to continue operating until the Sale can be approved. In the Debtor's sound business judgment, the DIP Loan will result in a benefit to the estate in that it will provide substantial funding for the Debtor's incurred and ongoing administrative expenses pursuant to the Budget while the Sale process takes place. Kim Dec. at ¶29.

## II. RELIEF REQUESTED

14. The standards for obtaining credit allowable as a priority administrative expense claim and secured by a priority lien on the Estate's assets are set forth in 11 U.S.C. § 364, which provides that:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;

{02531.002/00123310.DOC /}

7

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

              \*          \*          \*

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

    (A) the trustee is unable to obtain such credit otherwise; and

    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection

(e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."

15. "If the grant of a priming lien under § 364(d)(1) will not result in the diminution in value of an existing creditor's interest in the collateral, then the trustee's burden to provide adequate protection of the senior lien holder's interest under § 364(d)(2) will have been satisfied." In re Chicago, Missouri and Western Ry. Co., 90 B.R. 344, 360 (Bankr. N. D. Ill. 1988). In our case, the priming lien in favor of Citigroup will not result in the diminution in the value of an existing creditor's interest in the Properties, because: (i) Citigroup holds the first-priority lien against the Properties and all of the Estate's personal property; and (ii) Citigroup's claim is significantly undersecured, such that any holders of junior liens against the Properties effectively were unsecured claims as of the petition date. As such, no creditors will be harmed by the priming lien being granted to Citigroup. Moreover, to the extent any creditors assert a lien against the personal property with priority over Citigroup's lien, such creditors are adequately protected by the Claims Escrow that is being established under the terms of the Sale Motion to protect such creditors until those claims can be resolved. Finally, the Estate's creditors will benefit from and are adequately protected by the DIP Loan, because (as set forth in the Budget) the funds from the DIP Loan will be used to pay (among other things): (i) real property taxes, which if unpaid would result in a priority lien against the Properties; and (ii) administrative expenses, which if unpaid will have to be paid before any general

{02531.002/00123310.DOC /}

1 unsecured claims can be paid.

2 16. The DIP Loan is necessary to preserve the going concern value of the Debtor's Properties. As set forth above, the Debtor does not have funds to continue operating the Properties without the DIP Loan. As such, if the DIP Loan is not approved under the terms set forth in this Motion, then the Sale of the Properties as a going concern will be jeopardized--to the significant detriment of the creditors and employees who will benefit from the continued operation of the Properties. Accordingly, the Court should approve the DIP Loan. See In re Yellowstone Mountain Club, LLC, Case No. 08-61570-11 (Bankr. D. Mt. Dec. 17, 2008) (approving post-petition financing under Sections 364(c) and (d) to preserve the going concern value of the debtor).

17. Citigroup and the Debtor have negotiated the terms of the DIP Loan at arms' length, and Citigroup has agreed to provide the DIP Loan in good faith. As such, Citigroup is entitled to, and the Debtor respectfully asks the Court to grant to Citigroup, all of the protections of a good faith lender under 11 U.S.C. § 364(e).

## III. CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court enter an Order approving the DIP Loan on the terms and conditions set forth herein. The Debtor will separately seek expedited approval under Fed.R.Bankr.P. 4001(c)(2) for those advances necessary to cover expenses that must be paid within the 15-day notice period.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order authorizing the Debtor to obtain the DIP Loan on the terms provided herein and granting such other and further relief as the Court may deem appropriate.

///

///

///

///

///

{02531.002/00123310.DOC /}

9

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

| | | |
|---|---|---|
| 1 | Dated: November 4, 2009 | Respectfully submitted, |
| 2 | | McNUTT LAW GROUP LLP |

By:  */s/ Scott H. McNutt*
　　　Scott H. McNutt
　　　Michael A. Sweet
　　　Marianne M. Dickson
Attorneys for Kabuto Arizona Properties, LLC

Dated: November 4, 2009　　　Respectfully submitted,

ENGELMAN BERGER, P.C.

By:  */s/ DWE, SBA #004193*
　　　David Wm. Engelman
　　　Scott B. Cohen
　　　Patrick A. Clisham
Attorneys for Kabuto Arizona Properties, LLC

{02531.002/00123310.DOC /}